# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

United States of America,

    Plaintiff,

        v.

**[11] Jovanni Verestin Cruz, [20] Rocky Martinez-Negron, [27] Edgar Collazo-Rivera, [28] Carlos Raymundi-Hernandez,**

    Defendants.

CRIMINAL NO. 11-045 (PG)

## OMNIBUS OPINION AND ORDER

Defendants Jovanni Verestin-Cruz ("Verestin"), Rocky Martinez-Negron ("Martinez"), Edgar Collazo-Rivera ("Collazo"), and Carlos Raymundi-Hernandez's ("Raymundi") filed motions for acquittal under Rule 29 and/or for a new trial under Rule 33.[1] See Docket Nos. 1599, 1594, 1593, and 1600. The United States' (or "the government") responded opposing the defendants' requests. See Docket No. 1631. For the reasons that follow, the court **DENIES** the defendants' motions.

## I. BACKGROUND

On September 18, 2013, a grand jury returned a four-count superseding indictment charging defendants Verestin, Martinez, Collazo, Raymundi and 23 other co-defendants of various drug-trafficking offenses.[2] See Docket No. 184. On July 22, 2016, after an eleven-day trial, a jury convicted Verestin, Martinez, Collazo and Raymundi of conspiracy to possess with intent to distribute five kilograms or more of cocaine and less than one kilogram of heroin in violation of 21 U.S.C. § 846. The jury found Collazo guilty of two counts of money laundering, in violation of 18 U.S.C. § 1956; and Raymundi, of conspiracy to import five kilograms or more of cocaine and less than one kilogram of heroin in violation of 21 U.S.C. § 963. See Docket Nos. 1583-1586.

Shortly thereafter, the defendants filed motions under Rules 29 and 33 of the Federal Rules of Criminal Procedure, respectively. First, they assert the evidence presented by the government was insufficient to sustain their convictions, and therefore, request that the court set aside the jury verdicts and enter judgments of acquittal in accordance with Rule 29.[3] See Docket Nos.

---

[1] For ease of reference, the court may at times refer to the defendants and other coconspirators by their "a/k/a" (as identified when indicted) in order to remain consistent with the testimonial evidence on record.

[2] Collazo was also charged with two counts of money laundering. See Docket No. 184 at 7-11.

[3] In his motion for acquittal and new trial (Docket No. 1600), Raymundi joined the arguments in Collazo's motion for acquittal (Docket No. 1593), Verestin's motion for acquittal and new trial (Docket No. 1599), and Martinez's motion for acquittal or for a new trial (Docket

1593, 1594, 1599 and 1600. Some of the defendants also assert that errors in the jury selection process, several instances of prosecutorial misconduct, and undue intervention or comments by the court during the examination of witnesses, among others, constitute grounds for a new trial. In the interest of clarity, the court parses the defendants' Rule 33 arguments below.

### *Jovanni Verestin*

Verestin raises four separate grounds in his motion for a new trial. <u>See</u> Docket No. 1599. First, he claims the court's failure to conduct a proper voir dire during jury selection prevented the defense from exercising challenges for cause. He also raises a law enforcement bias issue with respect to one of the jurors. Second, Verestin asserts prosecutorial misconduct in the direct examination of two cooperating witnesses in order to elicit testimony regarding alleged murders or attempted murders, as well as error by the court due to the omission of that testimony (or its English translation) in the record. Third, Verestin argues the court committed error when it granted the government's motion to quash the subpoena directed to Homeland Security Investigations ("HSI") Special Agent ("SA") Carlos Carrasquillo. Finally, he alleges the court's comment about defense witness Jayson Davila's testimony requires a new trial.

### *Rocky Martinez*

Martinez's Rule 33 motion rests on four grounds as well. First, he argues the only witnesses that mentioned his name, Diego Perez-Colon, a/k/a "Dieguito" ("Perez-Colon" or "Dieguito") and Jorge Luis Figueroa-Agosto, signed cooperation agreements with the government in August 2011 and March 2012, respectively, and have remained in prison for almost five years pending sentencing. According to Martinez, this alone "is enough to grant a judgment of acquittal or at least a new trial." Docket No. 1594 at 2-3. Martinez also alleges errors in the jury selection process and the admission of "irrelevant, immaterial and prejudicial" documentary evidence.[4]

---

No. 1594). Collazo filed a motion (Docket No. 1601) joining the arguments presented "in DE # 1599 and 1600" by Verestin and Raymundi, respectively.

Because the defendants assert many common grounds in support of their motions for acquittal and/or motions for a new trial, the court will address those grounds conjointly in its analysis. Where a defendant supported his request for a judgment of acquittal and/or new trial with bases or grounds unique to him, the court will address that basis or ground separately.

[4] Although Martinez asks the court to consider "the reasons previously stated before this Honorable Court during Rule 29(a) and the hearings held during trial" in evaluating his motion, he provides no citation or reference to the voluminous transcripts on record. <u>See</u> Docket No. 1594 at 1. Defendant having failed to point the undersigned in the desired direction, at this time, there are no "previously stated" arguments for the court to review. <u>See</u> <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); <u>Rivera-Gomez v. de Castro</u>, 843 F.2d 631, 635 (1st Cir. 1988) ("Judges are not expected to be mindreaders.").

### *Edgar Collazo*

Collazo only moves for a judgment of acquittal under Rule 29. <u>See</u> Docket No. 1593. The court addresses his arguments in Section III of this Opinion and Order.

### *Carlos Raymundi*

Raymundi joined the arguments raised by Verestin and Martinez in their respective motions for acquittal and for a new trial. Like Verestin, Raymundi avers that (1) the court's comments about Jayson Davila's testimony, and (2) the court's order granting the government's motion to quash his subpoena directed to HIS SA Carrasquillo warrant a new trial. <u>See</u> Docket No. 1600.

## II.   STANDARD OF REVIEW

### A. Federal Rule of Criminal Procedure 29

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed.R.Crim.P. 29(c). In ruling on a motion under this rule, the court must view "the evidence in the light most flattering to the jury's guilty verdict, [and] assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt. <u>United States v. Lipscomb</u>, 539 F.3d 32, 40 (1st Cir. 2008) (alteration in original). In addition, the court will give "equal weight to direct and circumstantial evidence," <u>see</u> <u>United States v. Appolon</u>, 715 F.3d 362, 367 (1st Cir. 2013), and refrain from "assess[ing] the credibility of witnesses, as that is a role reserved for the jury." <u>Lipscomb</u>, 539 F.3d at 40 (<u>quoting</u> <u>United States v. Trinidad-Acosta</u>, 773 F.3d 298, 310-11 (1st Cir. 2014)). If, however, evidentiary conflicts, credibility questions or competing inferences (two or more of which are plausible) arise, the trial judge must resolve them in the prosecution's favor. <u>United States v. Olbres</u>, 61 F.3d 967, 970 (1st Cir. 1995).

In essence, "[t]he court's duty is to make sure the evidence is sufficient to support the conviction." <u>United States v. Guzman-Montanez</u>, 756 F.3d 1, 10 (1st Cir. 2014). Therefore, "[t]he government need not succeed in eliminating every possible theory consistent with the defendant's innocence." <u>Trinidad-Acosta</u>, 773 F.3d at 310-11 (<u>quoting</u> <u>United States v. Troy</u>, 583 F.3d 20, 24 (1st Cir. 2009). "And circumstantial evidence alone may be sufficient to provide a basis for conviction." <u>United States v. Rodriguez-Duran</u>, 507 F.3d 749, 758 (1st Cir. 2007). Consequently, "[d]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." <u>Lipscomb</u>, 539 F.3d 32, 40 (quoting <u>United States v. O'Shea</u>, 426 F.3d 475, 479 (1st Cir. 2005)).

**B. Federal Rule of Criminal Procedure 33**

Federal Rule of Criminal Procedure 33 provides that upon a defendant's motion, the court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). "'The remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result.'" United States v. Del-Valle, 566 F.3d 31, 38 (1st Cir. 2009) (quoting United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001)). A defendant may ground a motion for new trial on newly discovered evidence or other grounds. Fed.R.Crim.P. 33(b) "A new trial is granted 'sparingly,' and only where there would be 'a miscarriage of justice and where the evidence preponderates heavily against the verdict.'" United States v. Gonzalez-Perez, 778 F.3d 3, 17 (1st Cir. 2015) (citing United States v. Merlino, 592 F.3d 22, 32 (1st Cir. 2010)).

"[A] district court has greater latitude in considering a motion for a new trial than it does in considering a motion for acquittal…." Merlino, 592 F.3d at 33. "Motions for new trial are directed to the discretion of the trial court. In considering such a motion, the court has broad power to weigh the evidence and assess the credibility of both the witnesses who testified at trial and those whose testimony constitutes 'new' evidence." United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980) (citation omitted).

### III.  DISCUSSION

**A.   Acquittal**

As noted earlier, the defendants contend that the evidence was insufficient to support their convictions. We begin with a common thread to all defendants: the drug-conspiracy conviction. To sustain the same, "the government must show that [a] defendant knowingly agreed with at least one other person to commit a crime, intending that the underlying offense be completed." United States v. Alejandro-Montanez, 778 F.3d 352, 358 (1st Cir. 2015) (alteration in original) (quoting United States v. Ledee, 772 F.3d 21, 32 (1st Cir. 2014)). The agreement may be express or tacit, and proven directly or circumstantially. See United States v. Pena-Santos, 809 F.3d 686, 696 (1st Cir. 2015) (citing Trinidad-Acosta, 773 F.3d at 307). Similarly, to convict a defendant under 28 U.S.C. § 846, "the government must prove beyond a reasonable doubt that he knew about and voluntarily participated in the conspiracy,… and proof may come from direct or circumstantial evidence, like inferences drawn 'from members' "words and actions"' and from 'the interdependence of activities and persons involved.'" United States v. Acosta-Colon, 741 F.3d 179, 190 (1st Cir. 2013) (quoting United States v. Ortiz de Jesús, 230 F.3d 1, 5 (1st Cir. 2000)).

"It is hornbook law that a defendant may be found guilty of participating in a drug-trafficking conspiracy without knowing the full extent of the enterprise or the identities of all the coconspirators." Ortiz de Jesús, 230 F.3d at 5. Also, how one "participates" in a drug conspiracy is not limited to being an actual importer or distributor because "doing 'ancillary' task[s]

… can suffice, if done to further the conspiracy's objective." <u>Acosta-Colon</u>, 536 F.3d 197-98 (<u>citing</u> <u>United States v. Aviles-Colon</u>, 536 F.3d 1, 15 (1st Cir. 2008). Against this background, the court recounts the pertinent facts in the light most favorable to the jury's verdict.[5]

## 1. The Drug Conspiracy[6]

In 2005, Jose Figueroa-Agosto, a/k/a "Junior Capsula," his brother, Jorge Luis Figueroa-Agosto ("Jorge Luis"), and Jose Miguel Marrero-Martell, a/k/a "Pito Nariz" ("Marrero" or "Pito") began a drug smuggling scheme. <u>See</u> Docket No. 1564 (Trial Transcript Day 2). As the DTO begαn to grow, Elvin Torres-Estrada, a/k/a "Muñecon," Angel Ayala-Vazquez, a/k/a "Angelo Millones," and Samuel Negron-Hernandez, a/k/a "Sammy Toston," joined the organization as leaders of the wholesale distribution of narcotics in Puerto Rico. Other wholesale distributors included Rafael Santiago-Martinez, a/k/a "Pica," and Ismael Luna-Archeval, a/k/a "Maelo." The DTO depended on a legion of accomplices and supporters to further the drug-smuggling and distribution enterprise, and the evidence at trial outlined in detail each defendant's specific role in the DTO and the interdependent functions carried out by them at different stages of the operations. Likewise, the DTO relied on different coconspirators for the purchase of motor boats and vehicles that were essential not only to transport drugs and money, but also for concealing and laundering sale proceeds.

## 2. The Evidence

### The Starting Lineup

<u>Jose Marrero-Martell, a/k/a "Pito Nariz"</u> was the first cooperating witness called by the government. He participated in the drug-trafficking conspiracy by taking on different roles, including that of seller, carrier, and even administrator of Figueroa-Agosto's operations in Puerto Rico. In 2005, he joined the Figueroa-Agosto brothers in transporting $200,000 to the Dominican Republic in order to purchase 22 kilograms ("kilos") of cocaine for importation into Puerto Rico. <u>See</u> Docket No. 1564.

The organization began to grow as more men joined in. More men acting as carriers meant more transportation activity.[7] What started out as a 22-kilo

---

[5] In this case, the jury trial lasted eleven days and generated a voluminous record. Bear in mind that this drug-trafficking organization ("DTO") implicates a multitude of defendants, some indicted in related cases (e.g., Crim. Case Nos. 09-173 (PG) and 10-435 (PG)), who from 2005 to 2010 undertook well-organized and concerted efforts to purchase, smuggle, protect and distribute thousands of kilograms of narcotics, conducting businesses and other numerous financial transactions to launder the proceeds of their unlawful activities along the way. Thus, culling all of the relevant facts found in the trial record and bringing them to the fore to the defendants' and the government's satisfaction is not a simple task, more so when the parties fail to substantiate their arguments with appropriate citations to the record.

[6] Given the interplay of the facts which support the jury's conclusion of guilt on the possession/distribution count, and in Raymundi's case, the importation count, the court will address all drug conspiracy elements together without further distinction. At any rate, Raymundi has not properly developed his sufficiency of the evidence claim with respect to his importation conviction, and the court is under no obligation of doing it for him.

[7] In this drug-trafficking conspiracy, the term "courier" or "carrier" is used when referring to a person whose role was to transport drugs and/or sale proceeds from one point to

venture soon became a 40, 50, 70-kilo operation. Id. at 19-20. It was around this time that Torres-Estrada and other distributors became involved in the organization. Id. at 28-30. Leaders and members would agree on more than just transportation routes, methods or other operational logistics. See id. at 34-45. According to Marrero, the conspiratorial agreement even covered the price at which drug kilos were sold on the street.[8] Id. at 43.

From 2005 to 2007, Marrero worked as a carrier and charged between $1,500 and $2,500 per kilo of cocaine transported from the Dominican Republic to Puerto Rico. See id. at 24 and 30. His good relationship with Jorge Luis - Figueroa-Agosto's brother and the person "in charge" of business in Puerto Rico - provided him direct insight into the DTO's day-to-day operations.[9] After Jorge Luis retired, Marrero became the head of Figueroa-Agosto's operation in Puerto Rico. Id. at 34.

### THE X'S AND O'S OF MOVING KILOS

The operation was two-fold: first, to transport the drugs from the Dominican Republic to Puerto Rico, and upon their arrival, divide and hand out the drugs to distributors (or their employees), or further transport them to the continental U.S.; second, to transport the drug sale proceeds (large amounts of cash) from Puerto Rico to the Dominican Republic. Id. at 23. Built-in hidden compartments or systems were made or ordered and installed inside the vessels and vehicles in order to conceal drugs, money and weapons. Id. at 30, 31, 35 and 45-46. The drug-loaded vessels arrived on the shores of several municipalities in Puerto Rico, such as Boqueron or Vega Baja, which are located on the west corner and norther coast of Puerto Rico, respectively.[10]

Thereafter, the drugs were unloaded from the vessels, transferred into motor vehicles or trucks with similar built-in hidden compartments and transported to houses where DTO members frequently convened (e.g., Jose Molina-Quintero's ("Manolo") house in Vega Baja, as well as Rolando Melon-Baerga's ("Ronald") house in Cidra). Id. at 35 and 90. These houses, Marrero stated, were closer to the shores where the vessels arrived and provided a safer place for the distributors to pick up their share of the drug shipments.

---

another, e.g., from the Dominican Republic to Puerto Rico or vice versa. See id. at 24. The term "seller" is used when referring to a person who sold drugs at the street-level.

[8] Coconspirator Diego Perez-Colon ("Perez-Colon") testified that DTO leaders Junior Capsula and Torres-Estrada sometimes went as far as to manipulate or "fix" the street price of drug kilos. See Docket No. 1531 (Trial Transcript Day 4) at 93-94; Docket No. 1534 at 6.

[9] From 2005 to 2008, Jorge Luis managed "the office," the house used by the DTO to store and count both money and drugs. See id. at 24:21-24. As manager of the office, Jorge Luis received and stored some of the drug shipments that arrived in Puerto Rico, as well as the drug sale proceeds. In addition, he was in charge of hiring the carries who would transport the proceeds back to the Dominican Republic. See id. at 24-25. At trial, Jorge Luis corroborated this information. See Docket No. 1537 at 105 (explaining that the office was the place where the DTO stored, counted and packaged the money obtained from drug sales before sending it back to the Dominican Republic).

[10] The court notes that Marrero's testimony on this matter was corroborated by the two other cooperating witnesses, Perez-Colon and Jorge Luis. See Docket Nos. 1531, 1534, 1537 and 1547.

Id. at 88-90 and 120-123. Once the drugs were allotted among the DTO distributors, the drug-selling process took place. Marrero explained that during this phase, if a distributor or street-level runner or seller from one of the DTO's subgroups, such as Figueroa-Agosto's, ran out of kilos to sell, he or she could borrow kilos from Torres-Estrada.[11] Id. at 84. In such a case, the proceeds would go to the person who loaned the kilos. Id.

DRUG QUANTITIES

The government introduced evidence regarding specific drug quantities smuggled into and around Puerto Rico. Marrero, for example, testified that from mid-2008 until September of 2009 the DTO imported **at least 730 kilos** of narcotics into Puerto Rico intended for distribution. See id. at 44-46 and 80-83. Some of the drug shipments were seized by law enforcement authorities, including **(1)** 340 drug kilos aboard the vessel "La Oceanic,"[12] and **(2)** 150 drug kilos aboard a platform seized in 2009. See id. DEA forensic chemists conducted analyses of the evidence (brick-shaped packages) seized as a result of some of the searches carried out by law enforcement agents when investigating the case. Upon doing so, the chemists concluded that the substance contained in the brick-shaped packages was either cocaine or heroin. See e.g. Docket Nos. 1556, 1557 and 1559 (Fact Stipulations).

Marrero also identified a shipment of 580 kilos of narcotics that was stolen at some point in 2007. After that, security men – also referred to as "triggermen" – began to escort the drug shipments. See Docket No. 1564 at 36 and 44-45. The men who escorted the shipments, including Marrero, were armed. See id. at 36-37. This brings us to some of the evidence implicating Verestin, Martinez, Collazo and Raymundi, also known as Jova, Rocky, Edgar and Carlitos, respectively.

THE DEEP BENCH

*(So-called "ancillary roles")*

### i. *Jova Verestin*

Marrero identified Verestin as one of Torres-Estrada's security employees (also called a "triggerman" or "enforcer"). See Docket No. 1564 at 89 and 123. He testified that Verestin was hired to provide security at Torres-Estrada's house and would receive a drug kilo as payment for that work. Id.

---

[11] Perez-Colon went further into the "who's who" of the DTO and explained that this particular organization was composed of different but coexisting subgroups, two of which were led by Figueroa-Agosto and Torres-Estrada, respectively. Marrero, **Raymundi** and Perez-Colon himself were next in the chain-of-command, with each of them taking on administrative roles. See Docket No. 1531 at 88-89.

[12] At trial, Customs Border Patrol Officer Jose Ralat testified that in November of 2008, while assigned to the Anti-Terrorism Contraband Enforcement Team in the San Juan Seaport, he assisted in the inspection of 46-foot Bertram vessel – "La Oceanic" – where 340 kilo-shaped bricks were found inside. See Docket No. 1531 at 33-42; see also Docket No. 1559 (Fact Stipulation regarding DEA Forensic Chemist Elizabeth Adkins).

Notwithstanding, the fact is that security employees had to protect not only their coconspirators, but also the drug inventory and proceeds. And to that end, triggermen like Verestin were always armed. Id. at 36 and 122-123; see also Docket No. 1534 at 23-26.

Other witnesses painted a similar picture of Verestin's role as an enforcer or triggerman. Since the undersigned's Opinion and Order (Docket No. 1740) thoroughly discusses the evidence adduced at trial against Verestin, the court now adopts and incorporates it by reference herein. Viewing that evidence in light most favorable to the guilty verdict, a reasonable jury could conclude that Verestin knowingly and voluntarily entered into an agreement with other coconspirators to transport, store, cover up and protect drugs and drug money, as well as to provide security to leaders and members of the organization. Again, "a defendant may be found to be a part of the drug-trafficking conspiracy - despite a lack of participation in the drug collection, handling, or sales - based upon performance of ancillary functions (e.g., accounting, communications, and **strong-arm enforcement**)." United States v. Santos-Soto, 799 F.3d 49, 58 (1st Cir. 2015) (emphasis added) (citing United States v. Garcia-Torres, 280 F.3d 1, 4 (1st Cir. 2003)); see Aviles-Colon, 536 F.3d at 18 (holding that evidence of defendant's role as "triggerman" or "enforcer" for organization that was often at war with other drug organizations "was sufficient to permit a reasonable jury to conclude that he was part of drug conspiracy and not merely a 'hired gun.'")

Verestin asserts that evidence presented by the government was insufficient to prove "that he possessed cocaine or had the specific intent to distribute it[,]" but that does not help his case. See Docket No. 1599 at 3. First, Verestin fails to properly develop this point and the court will not warm the bench for arguments that are waived. See United States v. Diaz-Castro, 752 F.3d 101, 114 (1st Cir. 2014) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)) (finding that argument not clearly developed is deemed waived). But even if the court were to overlook this waiver, there is no merit to his suggestion because a defendant does not need to know the conspiracy inside out in order to be found guilty of participating in it. See Santos-Soto, 799 F.3d at 59 (citing United States v. Soto-Beniquez, 356 F.3d 1, 23 (1st Cir. 2003)) (also noting that a defendant need not know the identity of all coconspirators and may even join the conspiracy late).

Given that the evidence presented at trial against Verestin amply substantiates the jury verdict, his motion for acquittal is **DENIED.** The court will thus move on to discuss the evidence against Martinez.

### ii. *Rocky Martinez*

This particular defendant enters the drug-trafficking picture as a result of his employment relationship with one of this DTO's big distributors, Luna-Archeval (or "Maelo"). Docket No. 1531 at 95-96. According to coconspirator Perez-Colon, Maelo "[h]ad two employees; Gallego and Rocky … **And his boy was Rocky**." Id. at 123:25 and 124:1. Martinez administered Luna-Archeval's drug

inventory, which other coconspirators (e.g. Perez-Colon and Jorge Luis) typically delivered at Luna-Archeval's auto-parts business in Puerto Rico. See id. at 122-124. Perez-Colon also stated the frequency of his dealings with this defendant:

> Q.     And how many times did you deal directly with Rocky?
> A.     Multiple occasions.
> Q.     Can you give an estimate --
> A.     Five, six, seven. I mean, we would see each other a lot.
> Q.     Five, six, seven --
> A.     More.

Id. at 125:2-8. Perez-Colon indicated that when he ran out of drug kilos to sell, Luna-Archeval would loan him cocaine and heroin kilos and instruct him to pick them up at Martinez's house in Pajaros, where they were stored.[13] Id. at 126-128. There, Martinez "would take the kilos out" and give them to the witness.

The jury also heard the **testimony of coconspirator Jorge Luis Figueroa-Agosto**. See Docket Nos. 1537 and 1547. He testified that Luna-Archeval was "the boss of that gentleman," at which point he identified Martinez in court. Docket No. 1537 at 113. The prosecution asked Jorge Luis to describe the employment relationship, and the witness answered as follows:

> Q.     When you say that he was Maelo's employee, he was what kind of employee?
>
> A.     He was an employee that -- well, when I began to deliver kilos to Maelo, he had this concern that Maelo's house and to his workshop, that there was a lot of people going there. I told him that it worried me to leave the kilos there. And he told me not to worry, that the kilos weren't going to remain there; **that they were going to be kept in Rocky's house.**

Id. at 113:15-23. Later on, Jorge Luis identified specific drug quantities – between 100 and 200 kilos – that he personally handed to Martinez. See id. at 124:1-2.

In addition, the government introduced the **testimony of FBI Special Agent ("FBI-SA") Joseph Gonzalez** who investigated the case while assigned to drug trafficking and organized crime unit (or the "Squad CE-1 Unit") in San Juan, Puerto Rico. See Docket No. 1534 at 86-87. SA Gonzalez identified Luna-Archeval as a "major player" in the DTO and the recipient of large quantities of drug kilos. He further stated that Martinez was Luna-Archeval's employee, and that

---

[13] "Pajaros" as in Pajaros Ward (or "Barrio Pajaros," in Spanish) is located in Bayamon, Puerto Rico. The documentary evidence presented by the government at trial corroborates that Martinez listed a Pajaros Ward address as his residence. See e.g. Docket No. 1537 at 86-87; Government's Exhibit 85 (IRS Form 8300 dated 06/14/2008).

Martinez "worked for him in the drug-trafficking trade." Docket No. 1537 at 51:23-25.

Martinez argues that the testimony regarding the delivery of drugs at his workplace and home is not enough to establish that he "knew what was inside those boxes or that he was part of the conspiracy." Docket No. 1594 at 6. His argument fails for at least two reasons. First, whether or not he knew the specific controlled substances being delivered or distributed is inapposite. See United States v. Burgos, 703 F.3d 1, 43 (1st Cir. 2012) (citing United States v. Perez-Melendez, 599 F.3d 31, 40 (1st Cir. 2010) (to support drug conspiracy conviction, the government need only show that defendant knew the conspiracy involved a controlled substance," but not "the *specific* controlled substance being distributed."). Second, the Supreme Court recently held, "[a] specific intent to distribute drugs oneself is not required to secure a conviction for participating in a drug-trafficking conspiracy. **Agreeing to store drugs at one's house in support of the conspiracy may be sufficient**." Ocasio v. United States, 136 S. Ct. 1423, 1430 (2016) (emphasis added) (quoting United States v. Piper, 35 F.3d 611, 614 (1st Cir. 1994).

The court finds that the evidence presented at trial is sufficient to allow a reasonable jury to conclude not only that Martinez knew of and elected to join in the distribution scheme, but also that his role was necessary to ensure the success of distribution-related aspects of the scheme. Accordingly, his motion for acquittal is **DENIED**.

### iii.   *Edgar Collazo*

Coconspirators Marrero and Perez-Colon identified Collazo as a member of the DTO and participant of the organization's money-laundering scheme. See Docket No. 1564 at 53-54 and 65-68; Docket No. 1531 at 111-119. Marrero testified that in May 2009 Collazo delivered between $1.5 and $2.5 million via private vessel to the Dominican Republic.[14] Docket No. 1564 at 53. Several weeks later, Marrero saw Collazo at Torres-Estrada's house in Arroyo Hondo, Dominican Republic. Id. This information was corroborated by Perez-Colon, who stated that in 2009, Figueroa-Agosto and Torres-Estrada instructed him to deliver millions of dollars - drug proceeds - to Collazo, who would then take it to Santo Domingo in his vessel. Docket No. 1531 at 111-113:3-9; see also Docket No. 1564 at 66. Perez-Colon delivered the money to Collazo's business, and at one point even transferred $2 million to Collazo's truck. See id. at 114-119. He made it a rule to show Collazo the money, which was placed inside plastic bags that were sealed and numbered, so Collazo could be sure what they were dealing with.[15] Id. at 119.

---

[14] At trial, Marrero identified defendant Collazo in court. Id. at 53.

[15] Marrero, on the other hand, explained that Collazo received his cash payment in advance, that is, before delivering the money to the Dominican Republic. Docket No. 1564 at 67-70.

Perez-Colon could not explain why Collazo was picked by DTO leaders to deliver the money, but stated the following: "What I do know is that he had a good vessel and that he had a good last name. It's not the same thing if they stop Diego Perez-Colon in the water that [sic] they stop Empressas [sic] Collazo." Id. at 120:13-16. Collazo eventually brought an undocumented DTO distributor Negron-Hernandez, a/k/a "Sammy Toston," back to San Juan, Puerto Rico. Id. at 113:19-25 and 116:14-23.

According to Collazo, the evidence presented at trial established that he used checks prepared by AC Electroamericana, and that on two occasions he transported money to the Dominican Republic via motorboat. Yet, the defendant contends the evidence did not establish he prepared the checks, how he obtained them, that he knew the amount of money he transported or the fact that they represented the proceeds of illegal drug trafficking. Docket No. 1593 at 1-2. But the United States did introduce sufficient evidence with which to support Collazo's money-laundering conviction.[16]

Coconspirator Jorge Luis, for example, testified that the money with which the DTO vessels were purchased "had to go through checks that were sent for in a company that was called Electroamericana. And it would be coordinated through my brother and a woman by the name of Mary Pelaez." Docket No. 1537 at 108-109. His testimony further evinces the process employed to obtain those checks. See id. at 109 and 131-133. Moreover, the government presented the testimony of witness Victor Gomez, President of Gomez Hermanos Kennedy, an auto dealership in San Juan, Puerto Rico, who testified that in 2008 he sold a Porsche GT2 to defendant Collazo for more than $313,699. See Docket No. 1528 (Trial Transcript Day 3) at 77-92. Collazo, however, purchased the vehicle for DTO leader Torres-Estrada, using different payment methods and identities to complete the transaction.

In addition, the jury heard the testimony of several government witnesses who managed some of Collazo's insurance policies. See Docket Nos. 1528. One of them was Evelyn Montanez, a Marsh Saldaña employee, who testified that an insurance policy was issued in 2006 for a 1989 Davis yacht owned by Collazo. See id. at 130-135. Sandra Rios, executive assistant to former Marsh Saldaña CEO, testified that in 2008, Collazo delivered a brown paper bag to the office with $15,000 in cash inside that was used as payment for one of the insurance policies. Docket No. 1528 at 143-147. Finally, the parties stipulated the admissibility of Collazo's income tax returns into evidence. See Docket No. 1553. That evidence shows Collazo's reported income for the years in which he participated in the DTO.

Based on the testimony summarized above, a jury could have reasonably concluded that Collazo not only knew and intended to join in the drug-

---

[16] As the United States points out, the drug-trafficking conspiracy was paired with a money-laundering scheme that led a number of coconspirators to engage in financial acts to disguise the illicit source of the proceeds and promote drug-smuggling activities. The financial transactions relevant to this case, for the most part, consisted of purchasing motor vessels and vehicles, some of which were used to transport drugs and proceeds. See e.g. Docket No. 1537 at 108 and 130-133.

trafficking conspiracy, but also that his participation was essential to ensure and further the drug-smuggling activities. Moreover, the court concludes that the evidence against Collazo sufficiently supports the jury's verdict with respect to the money-laundering conviction. See United States v. Romero-Lopez, 695 F.3d 17, 24 (1st Cir. 2012) (citing United States v. Mangual-Santiago, 562 F.3d 411 (1st Cir. 2009)). Accordingly, his motion for acquittal is **DENIED**.

### iv. Carlos Raymundi

Given the evidence recounted thus far, the court need not dwell on Raymundi's sufficiency claim.

When coconspirator Marrero stepped down from his role as leader of Figueroa-Agosto's group in Puerto Rico in 2009, Perez-Colon and Raymundi took over Marrero's responsibilities. Docket No. 1531 at 100; Docket No. 1564 at 75-77 and 87-90. Together with Perez-Colon, Raymundi coordinated and oversaw the arrival of drug shipments in Puerto Rico, as well as the transportation and administration of the drug kilos thereafter. This entailed unloading the drugs from the vessels and transporting them via motor vehicles to specified locations (e.g., the Vega Baja house). Docket No. 1531 at 101-104. Perez-Colon took the kilos that belonged to Junior Capsula, and Raymundi took the kilos that belonged to Torres-Estrada. In 2009, **Perez-Colon and Raymundi received between five and six shipments** with each one containing between 150 and 200 kilos of cocaine and heroin. Id. at 102-104. Perez-Colon estimated sale proceeds ranging from $1 million to $2 million. Tellingly, Raymundi was described as someone who enjoyed the trust of DTO leader Torres-Estrada and Figueroa-Agosto.[17] Id. at 101; Docket No. 1564 at 83.

Based on the evidence recited above, a jury could reasonably conclude that Raymundi joined in and actively participated in the conspiracy by undertaking a managerial-like role that was critical to ensure the influx and distribution of large quantities of cocaine and heroin. There is also sufficient proof of Raymundi's ties to other coconspirators (e.g., Marrero, Perez-Colon and Verestin) to permit a jury to find interdependency and participant overlap in the management of the drug inventory. See United States v. Negron-Sostre, 790 F.3d 295 (1st Cir. 2015) (evidence establishing the defendants' ongoing presence and interactions with each other at a highly-organized, around-the-clock operation was circumstantially sufficient to support the defendants' conviction of conspiracy to possess with intent to distribute narcotics); Alejandro-Montanez, 778 F.3d 352.

Because the evidence presented against Raymundi is enough for a jury to find beyond a reasonable doubt that he was part of this conspiracy and that

---

[17] There is also evidence showing that from 2009 to 2010, Raymundi filed income tax returns indicating that he was employed by SN Trucking, a company owned by DTO distributor Negron-Hernandez. See Docket No. 1554 (Stipulation of Facts No. 2).

he played a crucial role in its continuing success, his motion for acquittal is **DENIED.**

The defendants attempted to shoot their shot with their motions under Rule 29, but they nevertheless have fallen woefully short of persuading the court. We must therefore decide the fate of the defendants' last second attempt at the basket: their motions under Rule 33.

### B.    New Trial[18]

### 1. Jury Selection

The Sixth Amendment to the Constitution guarantees defendants' right to an impartial jury. U.S. Const. amend. VI. "An impartial jury is one 'capable and willing to decide the case solely on the evidence before it.'" Sampson v. United States, 724 F.3d 150, 163 (1st Cir. 2013) (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)). Generally, the presence of bias in the person or persons charged with determining criminal responsibility will require a new trial without consideration of actual prejudice. See Vasquez v. Hillery, 474 U.S. 254, 263 (1986). Yes, defendants are entitled to a fair trial but not a perfect one. See McDonough, 464 U.S. at 555. The Supreme Court has thus "explained that parties cannot be granted a new trial if the only purpose is 'to recreate the peremptory challenge process because counsel lacked … information.'" Sampson, 724 F.3d at 164 (quoting McDonough, 464 U.S. at 555).

The defendants aver that during jury selection, the court did not allow the defense to exercise for cause challenges to potential jurors.[19] In its response, the government first points out that during the jury selection process the court addressed the few concerns or objections made by the defendants. Second, no specific objections were made in regard to the court's questions or the potential jurors' answers. Third, the simple assertion that the court's questions prevented the defendants from exercising challenges for cause, without more, does not warrant a new trial. See Docket No. 1631 at 25. The court agrees with the government.

Here, forty-six prospective jurors were interviewed during voir dire. The government was granted six peremptory challenges, and the defense, ten peremptory challenges, plus one peremptory challenge to each party for an alternate juror. Furthermore, upon additional questioning, several jurors were excused for cause. Thus, the defendants' unsubstantiated claim that the jury was empaneled without the benefit of a constitutionally adequate voir dire, without more, necessarily fails.

---

[18] As previously noted, Collazo did not file a motion for a new trial under Rule 33. See Docket No. 1593. Thus, all references to "the defendants" shall include only Verestin, Martinez and Raymundi.

[19] To quote the language used by Verestin, "[i]n this case, the generalized questioning by the Court did not provide sufficient information for counsel to intelligently exercise challenges for cause." Docket No. 1599 at 6.

   The defendants next assert that another "for cause" challenge issue arose when a juror (Juror Number 1) stated she had a brother that retired from FURA, a PRPD law enforcement agency. At the time the jury was selected, the government had not disclose it would call former FURA pilot Special Agent Miguel Bermudez as a witness. Defendants argue this deprived them "of the opportunity to raise a challenge for cause before the trial was underway." Docket No. 1599 at 6. As defendants readily concede, however, SA Bermudez revealed his affiliation with FURA during direct examination. Upon Verestin's request for a voir dire, the court excused the jury and called Juror Number 1 in for questioning in the undersigned's chambers. There, the court conducted a series of questions concerning the potential bias in favor of law enforcement. <u>See</u> Docket No. 1531 at 19-23.

|  |  |
|---|---|
| The Court: | Now, here is what I want to ask you – and don't be afraid to answer, and don't be afraid of all of us. Since we try to have jurors that are able to reach a verdict of guilty or not guilty based just on the evidence presented at trial, and I don't want any outside influences which could some way or other sway you one way or the other. Since you have a brother that worked with FURA, then my question to you is, the fact that your brother worked in the Police of Puerto Rico at some point in time during his career, he was assigned to FURA, the boat captain – and he is retired from the Police, FURA, the fact that there's been testimony here as to FURA and helicopters and that, does that in any way prevent you from rendering a fair and impartial verdict based on the evidence presented and my instructions as to the law? And be very frank with us. |
| Juror Number 1: | No, because I, like an auditor, I have to be objective all the time in my work, so -- |
| The Court: | You will apply the same principles of your job as an auditor…to this case and the evidence? |
| Juror Number 1: | Yes, because that's what I do all the time. I just have to evaluate the…findings, the evidence. That's what I always have to do in my job. |
| The Court: | And that's what you would do here in this case also with the evidence? |
| Juror Number 1: | Yes. |

   <u>Id.</u> at 21:22-25; 22:1-25; 23:1-7.

   The First Circuit has said that "when government agents are key witnesses, the trial court should ordinarily ask … jurors whether they are 'inclined to have greater faith in the agents' testimony merely by virtue of their official position.'" <u>Pongonis v. Desantis</u>, 979 F.2d 844 (1st Cir. 1992) (alteration in original) (<u>quoting</u> <u>United States v. Victoria-Peguero</u>, 920 F.2d 77, 84 (1st Cir. 1990)); <u>but see</u> <u>United States v. Cardales</u>, 168 F.3d 548, 556 (1st Cir. 1999) (district court did not err by failing to ask all potential jurors about any positive bias toward the testimony of law enforcement officers

where counsel for defendant requested such bias inquiry with respect to only two jurors, and the district court complied with both requests). In this case, the court did question Juror Number 1 on the issue of law enforcement bias and instructed her against any such bias. And the transcript of proceedings so show. Moreover, after the court excused the juror, the attorneys stated they were satisfied with the bias inquiry. See Docket No. 1531 at 23-24. This, the court believes, is enough to clip the wings of this argument.

### 2. Prosecutorial Misconduct

The defendants contend that the prosecution violated this court's order directing the prosecution to instruct its witnesses not to mention alleged murders or attempted murders by the defendants and other members of the DTO. Docket No. 1599 at 7. They also suggests that the court committed error because at one point it instructed the prosecution to "move on" to another question, thus preventing the Spanish to English translation of a witness's "highly prejudicial answer" into the record. Id. at 13-14. Nevertheless, they argue that because the jury heard the answer in Spanish, the damage was done.

"The determination of whether prosecutorial misconduct 'has so poisoned the well that a new trial is required,'" United States v. Rodriguez-De Jesus, 202 F.3d 482, 485 (1st Cir. 2000) (quoting United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994)), is bounded by the weighing of four factors: "(1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant." Id. In this analysis, the court "takes a balanced view of the evidence in the record." Id. (citing United States v. Roberts, 119 F.3d 1006, 1008 (1st Cir. 1997); Arrieta-Agressot v. United States, 3 F.3d 525, 528 (1st Cir. 1993)).

The first instance of prosecutorial misconduct alleged by the defendants occurred when the prosecutor asked cooperating witness Marrero to explain why the men – DTO members –  who travelled to the Dominican Republic in December of 2009 brought weapons along. Docket No. 1564 at 93. They assert that in doing so, the prosecutor elicited testimony regarding the murder of Colonel Amado Gonzalez.[20] Notwithstanding, the record shows that the question at issue was asked without any objection on the part of the defense. In fact, the government proceeded to ask at least thirteen more questions before any objection was made. When Verestin's attorney finally moved to strike the testimony in question, the court granted his request and gave the following instruction: "Everything about the trip to the Dominican Republic to carry out some kind of order to murder somebody, that should all be stricken, ladies and gentlemen." Id. at 96:25-97:1-3. In light of the four factors mentioned above, and in particular the curative measures employed by the court and their

---

[20] According to Marrero and Perez-Colon, Colonel Amado Gonzalez was a former colonel in the Dominican National Police and an alleged participant of this DTO.

likely effect on the jury, the court believes that the alleged instance of misconduct did not cause any serious prejudice so as to require a new trial.[21]

In addition, the defendants allege that another instance of prosecutorial misconduct occurred during the direct examination of cooperating witness Perez-Colon. See Docket Nos. 1531 and 1534. As previously discussed, Perez-Colon was a loyal member of the DTO and occupied a prominent, managerial role in the upper echelons of the organization. As part of his testimony, the witness explained the logistics of the drug-smuggling operation. The portion of his testimony relevant to the matter at hand involves the DTO's decision to transport and smuggle kilos via yawls. But contrary to what the defendants argue, the prosecutor did not elicit testimony regarding any alleged murders or attempted murders. As the record reflects, the prosecutor simply asked Perez-Colon the following:

> Q:   So then you mentioned that the organization started using yawls.
> A:   That's right, yes. Correct.
> Q:   And how do you know that?
> A:   Because I participated in it.
> Q:   And how, if at all, did that change the operation of brining the kilos to Puerto Rico?
> A:   What happens is that the person in charge of that was Pito, was Jose Marrero Martell. What happens is that Pito had a nephew who died because he had stolen two kilos - Pito worked with Carlitos.

See id. at 99:17-25 and 100:1-2.

Considering the context in which the challenged incident took place, the court finds that the record does not support the defendants' argument that the prosecution asked a question with the intention of violating or bypassing the court's ruling prohibiting this line of questioning. And even if that were the prosecution's intention, which the court again stresses is unlikely, the court interfered before any prejudicial answer by the witness could reach the jury. The record, in fact, shows that Perez-Colon neither mentioned the name "Menor" nor the word "murder" (or "killing," or any synonym for that matter). All that the witness stated was that Marrero's nephew died. Therefore, the jury could well have inferred that Marrero's nephew died because he ingested the two stolen kilos and nothing more. Consequently, the defendants' arguments on this matter fail.

Lastly, the defendants claim that the prosecutor elicited inadmissible testimony by asking Perez-Colon if he knew a man by the name of David. As he was answering, the witness recalled a conversation in which the alleged murder of Marrero's nephew, Menor, had been discussed. Nonetheless, the court interrupted Perez-Colon and instructed the prosecutor to move on. See Docket

---

[21] Also, at the closing of trial, the undersigned advised the jury that "[a]nything that I have excluded from evidence or ordered stricken and instructed you to disregard is not evidence, and you must not consider the same." Docket No. 1628 at 116.

No. 1534 at 28. Again, context is key. The record shows that the government's line of questioning turned on the identities and roles of several DTO members who traveled to the Dominican Republic to conduct DTO-related task. As a result, Perez-Colon was able to identify Verestin and establish a connection between said defendant and other coconspirators. Having heard, observed and read that witness's testimony, the court can ascertain that this particularly witness's narrative was consistently descriptive, and thus, the comments challenged by the defendants may well be a byproduct of Perez-Colon's storytelling capabilities.

Taking a balanced view of the evidence, the court concludes that the alleged instances of prosecutorial misconduct did not bring about the kind of prejudice that requires granting a new trial.

### 3. Motions to Quash

Verestin and Raymundi aver the court erred in denying them the opportunity to present the testimony of HSI SA Carrasquillo because of Federal Rule of Evidence 608.[22] See Docket No. 1599 at 15. Defendants now argue they sought to call SA Carrasquillo as a fact (i.e. not _solely_ an impeachment) witness in order to cover material issues of fact personally known to him.[23] Verestin's motion goes on to explain that the fact "[t]hat [SA Carrasquillo's] testimony would also demonstrate that the government's cooperating witnesses were lying does not render his testimony inadmissible." Id. at 16. In its response, the government contends that since the purpose of SA Carrasquillo's testimony – as proffered by the defendants then – was to collaterally impeach the cooperating witnesses' credibility with extrinsic evidence, the court's ruling should stand. See Docket No. 1631 at 28-29. As the government sees it, by not presenting the testimony's "newly disclosed" purpose at an earlier moment, defendants waived their argument.

Rule 608 provides, in pertinent part, that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to

---

[22] Before setting forth the analysis relevant to the evidentiary matter at hand, we address two issues presented to the court when reviewing Verestin's motion for a new trial which, as previously noted, Raymundi has joined. First, Verestin's motion states the United States moved to quash the subpoenas directed to SA Carrasquillo and SA Mario Renteria, when in fact, it only moved to quash the subpoena directed to SA Carrasquillo. See Docket Nos. 1542 and 1543. Second, the motion states the court allowed the defense to question SA Renteria "indicating that as to Renteria, there was no Touhy violation." Id. (alteration in original). Nonetheless, in ruling on the motion, the undersigned specifically stated:

> The Court:   Motion to quash subpoena is granted based on the collateral impeachment. **I am not ruling whether they did comply or did not comply with the Touhy regulations.**

Docket No. 1547 at 44:24-25 and 45:1-2 (emphasis added). Thus, whether or not the defendants complied with Touhy is irrelevant for present purposes.

[23] SA Carrasquillo was one of the HSI agents who investigated the criminal activities of this particular DTO. With trial underway, Verestin and Raymundi each served HSI with a subpoena request (also called a Touhy request after United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951)) stating that the agent's testimony and knowledge regarding prior statements made by Perez-Colon, Marrero and Figueroa-Agosto was "essential for impeachment." See e.g. Docket No. 1543.

attack or support the witness's character for truthfulness." Fed.R.Evid. 608(b). Under common law principles, this rule bars the use of extrinsic evidence for impeachment purposes if it relates only to a collateral matter. United States v. DeCologero, 530 F.3d 36, 60 (1st Cir. 2008) (citing United States v. Marino, 277 F.3d 11, 24 (1st Cir. 2002)). "A matter is collateral if 'the matter itself is not relevant to the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.'" Marino, 277 F.3d at 24 (quoting United States v. Beauchamp, 986 F.2d 1, 3 (1st Cir. 1993)).

The defendants argue that Rule 608 does not apply to evidence offered to contradict a witness's testimony as to a material issue of fact. Docket No. 1599 at 16. And in a similar context, the First Circuit recently held that the testimony of a witness was not collateral "because the possibility that the three linchpin witnesses colluded to fabricate incriminating testimony goes to the very core of this case and potentially compromises every piece of factual evidence the government had against" the defendants. United States v. Flores-Rivera, 787 F.3d 1, 20 (1st Cir. 2015).

On the other hand, the fact is that the defense cross-examined two of the cooperating witnesses in question, Marrero and Perez-Colon, on the alleged prior inconsistent statements given during the interview with SA Carrasquillo, receiving favorable answers on both turns. As an example, the court quotes some of Perez-Colon's answers:

> Q:   Do you know Agent Carlos Carrasquillo?
> A:   Yes.
> Q:   Can you state how many times you were interviewed by Mr. Carrasquillo?
> A:   In almost all the interviews.
> Q:   So the first interview that you met Carlos Carrasquillo was on December 9, 2009, when you got detained in Dominican Republic?
> A:   … Yes, that was an interview that was conducted with us… **I wasn't cooperating and half of the things I said were a lie.**

Docket No. 1534 at 129:7-22 (emphasis added). Marrero, too, admitted that his interview with SA Carrasquillo was plagued with false information: **"All of the information I gave was false…Everything was false."** Docket No. 1564 at 41:11-16 (emphasis added). It is also worth noting that the defense had an opportunity to cross-examine HSI SA Clemente who, together with HSI SA Carrasquillo, interviewed the seven coconspirators detained in the Dominican Republic in December of 2009. See Docket No. 1528 at 161-167. Indeed, the questions made by Raymundi's attorney during cross-examination prompted the court to instruct counsel against impeaching coconspirator Marrero through the testimony of SA Clemente, to which counsel responded: **"I already did impeach Marrero for that."** Id. at 167:4-5 (emphasis added).

The defendants next aver that the fact that the subpoena request as to SA Mario Renteria was granted and the request as to SA Carrasquillo was denied

"despite the obvious parallel purpose and identical degree of conformity with the Touhy requirements, demonstrates that the defense should have been permitted to call Agent Carrasquillo as well." Docket No. 1599 at 15. But this argument lacks force, not least because if "the testimony of both agents was offered for the same evidentiary purpose," id., it would be cumulative evidence that could be excluded on that basis, a decision that would fall well within the court's discretion. See Fed.R.Evid. 403.

Against this background, the court concludes that it did not err in excluding SA Carrasquillo's testimony.

### 4. The Court's Comments

Finally, the defendants take issue with the court's comments regarding the relevance of the testimony of defense witness Jayson Davila Reyes ("Davila"). Specifically, they claim that the comments made on the weight and value of Davila's testimony had the effect of discrediting its relevance and importance, which was central to the defense's theory. Docket No. 1594 at 5; Docket No. 1599 at 17, and Docket No. 1600 at 2.

Succinctly, Davila explained that during his stay at the Metropolitan Detention Center ("MDC") in Guaynabo, Puerto Rico, government witness Perez-Colon asked him to provide false or incriminating information against Torres-Estrada and his men in exchange for money. See Docket No. 1547 at 64-66. Apparently, Perez-Colon was upset with Torres-Estrada and "wanted to hit Muñecon with everything he had." Id. at 69:3-4. Davila, who at the time was also having "problems" with Torres-Estrada, stated that Perez-Colon specifically asked for information on "Carnal, Ronald, Muñecon, even Jovanni himself." Id. at 66:13-14. Marrero (or "Pito"), on the other hand, never asked Davila to provide information implicating Jova or his co-defendants.

As part of his direct examination, Davila stated that he pled guilty to several drug-trafficking related offenses, and that in 2005, he was arrested on drug possession and firearm charges. That arrest also involved two members of this DTO, Ramon Molina-Quintero ("Carnal") and Jose Molina-Quintero's ("Manolo"). Davila, however, **was not part of the Junior Capsula organization**. He knew Marrero and Perez-Colon "from the clubs and being out on the street," and got to know them better at MDC. Id. at 64:11-13 and 66:15-17. As for his relationship with Verestin, Davila stated: "I haven't been able to -- I haven't been with him at MDC or anything like that, but I know him the same way we all knew each other. We are from the same area." Id. at 67:4-6.

The defense further inquired into the witness's relationship with Verestin, and the witness gave the following answers:

> Q.    Did you ever see Jovanni Varestin [sic] Cruz
>       with a gun?
> A.    No.
> Q.    Did you ever see Jovanni Varestin [sic] Cruz
>       commit a violent act?
> A.    No.

> Q.    How many times before this event had you ever
>       seen Jovanni Varestin [sic]?
> A.    A few times. A few times. It's not like we saw
>       each other and spent a lot of time together.
>       Maybe ten times.
> Q.    And you never saw him with a gun in any of
>       those times?
> A.    No.

Id. at 67:15-25.

During cross-examination, the government asked Davila a series of questions related to the drug-trafficking charges for which he pled guilty and his relationship with other members of this DTO. The witness refused to answer the prosecution's question. What is more, the questions and answers themselves were interjected with the defense's objections. At one point, Verestin's attorney objected on the grounds that the government's questioning was beyond the scope, as well as an attempt at "eliciting information that [was] not relevant to this trial…." Id. at 78:5-8. The court responded that Davila's testimony "is not relevant in this case." Id. at 78:9-10.

Trial court history has taught us that "a trial judge should be fair and impartial in his or her comments during a jury trial." United States v. Ayala-Vazquez, 751 F.3d 1, 23-24 (1st Cir. 2014) (quoting United States v. de la Cruz-Paulino, 61 F.3d 986, 997 (1st Cir. 1995)). The First Circuit has clarified that "[a] judge's permissible participation includes the 'common law power to question witnesses and to analyze, dissect, explain, summarize, and comment on the evidence.'" Id. at 24 (quoting Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997)). Assuming arguendo that the undersigned's comment regarding the relevance of Davila's testimony had any potential for prejudice, the relevant question is whether it was dispelled by any appropriate curative instructions. See United States v. PaganFerrer, 736 F.3d 573, 587 (1st Cir. 2013) (citation omitted). And the record in this case shows that it was. Specifically, as part of the jury instructions, the court stated as follows:

> During the course of the trial, I occasionally have asked questions of a
> witness. Do not assume that I hold any opinion on the matters to which my
> questions may relate. The Court may ask questions simply to clarify a
> matter not to help one side of the case or hurt the other. Remember at
> all times that you as jurors are at liberty to disregard all comments of
> the Court in arriving at your own findings as to the facts. So anything
> I may have said during the course of the trial is not evidence also.

Docket No. 1628 at 116:16-24. Moreover, neither Davila's testimony nor any comment by the court would be enough to overcome the overwhelming evidence of guilt presented against the defendants at trial. But to recapitulate, the court notes that the wealth of evidence so adduced showed the existence of an agreement between DTO leaders and members, including the above-captioned defendants, and other persons known and unknown to possess, transport and

distribute narcotics.[24] The evidence also showed in great detail the methods employed by the organization to carry out further drug-trafficking operations.

    The jury heard the testimony of three cooperating witnesses, Marrero, Perez-Colon and Jorge Luis, who asserted they were members of the conspiracy. Having occupied positions in the upper echelons of the DTO, their testimonies illustrated the logistics of the DTO's day-to-day operations, as well as the roles and responsibilities of Verestin, Martinez, Collazo and Raymundi. The government also presented testimonial and documentary evidence that corroborated the coconspirators' accounts of the events.

### IV.   OTHER MATTERS

    As noted earlier, defendant Martinez raises other grounds in support of his motion. Docket No. 1594. One of those grounds hinges on the fact that the two coconspirators who mentioned his name at trial had not been sentenced.[25] He suggests that because the evidence against him rests heavily on their testimonies, his motion for acquittal or, alternatively, for a new trial should be granted, and cites  United States v. Hernandez, 109 F.3d 13, 17-18 (1st Cir. 1999) in support thereof. In that case, the First Circuit criticized the practice of holding cooperating witnesses in prison and awaiting sentencing for prolonged periods of time. Nonetheless, in the instant case, the record shows that the jury was made aware of the cooperation and plea agreements entered into between the government and the cooperating witnesses, and found their testimonies credible nonetheless. See United States v. Arizaga, 187 F.3d 623 (1st Cir. 1999) (noting that a conviction based solely on the uncorroborated testimony of an accomplice can be upheld, so long as the jury receives appropriate instructions and the testimony is not incredible as a matter of law or insubstantial on its face). See Docket No. 1628 at 118 (jury instructions regarding cooperating witnesses' testimonies).

    Martinez also claims that the court erred in allowing his financial records, namely, tax returns filed with the Treasury Department of Puerto Rico and the documents related to the purchase of a vehicle into evidence. Docket No. 1594 at 3-4. Furthermore, he suggests that the prosecution withheld Jorge Luis Figueroa-Agosto's proffer letter, which constituted Giglio material. Id. at 4. Suffice it to say that Martinez's failure to properly develop these arguments results in waiver of the same. See Diaz-Castro, 752 F.3d at 114 (citing Zannino, 895 F.2d at 17). Insofar as this defendant has either failed to develop or properly support his arguments and, alternatively, because they are belied by the record, his motion at Docket No. 1594 is (again) DENIED.

---

[24] In Raymundi's case, that evidence also substantiates his conviction as to the importation count (or count one of the superseding indictment). And in Collazo's case, the evidence is sufficient to support his money-laundering conviction.

[25] Martinez's motion mentions that Jorge Luis and Perez-Colon have not been sentenced. A review of the docket shows that Jorge Luis was sentenced on August 2016, and Perez-Colon was sentenced on January 2016. The trial in this case was held in July 2016.

## V. CONCLUSION

When all is said and done, and the full-court press of the defense notwithstanding, there is ample evidence with which to conclude that the defendants entered into an agreement to smuggle and distribute cocaine and heroin, and that in so doing, each defendant assumed conspiratorial responsibility. None of the challenges raised by the defendants require a new trial, either. Thus, for the reasons explained above, their motions under Rule 29 and Rule 33, respectively (Docket Nos. 1593, 1594, 1599 and 1600), are hereby **DENIED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, May 23, 2017.

S/JUAN M. PÉREZ-GIMÉNEZ
**JUAN M. PEREZ-GIMENEZ**
**SENIOR U.S. DISTRICT JUDGE**