IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff**,

        **v.**

JOVANNY VARESTÍN-CRUZ [11],
ROCKY MARTÍNEZ-NEGRÓN [20],
EDGAR COLLAZO-RIVERA [27],
CARLOS RAYMUNDI-HERNÁNDEZ [28],

    **Defendants**.

**Criminal No.** 11-045 (FAB)

# OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Jovanny Varestín-Cruz ("Varestín")'s motion requesting a hearing and an order. <u>See</u> Docket No. 1967. Varestín alleges that the government has improperly withheld material that is exculpatory or which would impeach the credibility of the principal witnesses that testified against him at trial. <u>Id.</u> Varestín's motion is joined by defendants Rocky Martínez-Negrón ("Martínez"), Edgar Collazo-Rivera ("Collazo"), and Carlos Raymundi-Hernández ("Raymundi"). <u>See</u> Docket Nos. 1987-92. All four defendants—Varestín, Martínez, Collazo, and Raymundi—are collectively described in this opinion as the "defendants." For reasons set forth below, Varestín's

motion, see Docket No. 1967, is **DENIED** and the other defendants'

joinder motions (Docket Nos. 1987-92) are **MOOT.**

## I.   Background

### A.   Defendants' Trial

The following pages summarize relevant portions of the

defendants' trial transcripts.  This Court did not preside over

the defendants' trial.  The thorough review helps the Court to

determine whether the defendants have met the burden applicable to

their requested relief.

The defendants' burden is, in part, as follows (a more

fully elaborated statement of that burden is set forth later in

this opinion):  A defendant seeking to prevail on a claim that

exculpatory or impeachment material was improperly withheld by the

prosecution—i.e., a Brady or Giglio claim—must show a reasonable

probability that the result of the proceeding would have been

different had the withheld evidence been disclosed.  Cone v. Bell,

556 U.S. 449, 469-70 (2009); Strickler v. Greene, 527 U.S. 263,

280 (1999); United States v. Peake, 874 F.3d 65, 69 (1st Cir.

2017); United States v. Colón-Muñoz, 318 F.3d 348, 359 (1st Cir.

2003); see also Giglio v. United States, 405 U.S. 150 (1972); Brady

v. Maryland, 373 U.S. 83 (1963).  To obtain an evidentiary hearing

on such a claim, a defendant must make a sufficient threshold

showing that material facts are in doubt or dispute.  See, e.g.,

United States v. Connolly, 504 F.3d 206, 219-20 (1st Cir. 2007);

Colón-Muñoz, 318 F.3d at 358-60; United States v. Denunzio, 123

F. Supp. 3d 135, 145 (D. Mass. 2015).

### 1.   Charges

The defendants were charged with conspiracy to
import controlled substances in violation of 21 U.S.C. sections
952 and 963.   See Docket No. 184 at pp. 3-4.   They were also
charged with conspiracy to possess with intent to distribute
controlled substances in violation of 21 U.S.C. section 846.   Id.
at pp. 4-5.   Additionally, Collazo was charged with international
money laundering and conspiracy to commit money laundering in
violation of 18 U.S.C. section 1956.   Id. at pp. 7-11.

### 2.   Trial Proceeding

Defendants' trial took place between July 8 and
July 22, 2016.   See Docket Nos. 1523, 1582.   Judge Juan Pérez-
Giménez presided.   See id.

### 3.   Carlos Roscoe

The government's first witness at trial was Carlos
Roscoe.   See Docket No. 1517 at p. 3.   He is a special agent with
the Federal Bureau of Investigation ("FBI").   Id.   In June 2010,
he led a team searching the residence of Elvin Torres-Estrada
("Torres").   Id. at p. 5.   A number of items typically associated
with drug trafficking were found.   Id. at pp. 7-30.

### 4. Marrero

The government then called José Marrero-Martell ("Marrero") as a witness. See Docket No. 1564 at p. 10. He was a drug dealer and drug trafficker for much of his life. See id. at pp. 11–12.

Marrero worked as a drug trafficker at the direction of José Figueroa-Agosto ("Figueroa"), known as "Junior Cápsula." See Docket No. 1539 at p. 73; Docket No. 1564 at pp. 11–12. Marrero was part of Figueroa's organization; he was not part of Torres' organization. See Docket No. 1539 at pp. 14, 73.

Marrero began trafficking drugs with Figueroa in 2005. See Docket No. 1564 at pp. 19–20. At that time, he and Figueroa, together with Figueroa's brother Jorge Figueroa-Agosto, decided to take money to the Dominican Republic and bring back drugs. Id.

Marrero, Figueroa, and Figueroa's brother had different roles. From 2005 to 2007, Marrero transported the drugs from the Dominican Republic, Figueroa's brother oversaw the Puerto Rico operation, and Figueroa was responsible for the Dominican Republic operation. Id. at pp. 24, 28. In 2008, after Figueroa's brother retired, Marrero led the organization in Puerto Rico. Id. at p. 34.

Early on, those three began working with others.
Id. at p. 29. The three did not have a network for distributing
drugs in Puerto Rico or the continental United States. See id.
Others, including Torres, had a distribution network. Id. Torres
and others were provided the opportunity to purchase drugs from
the Dominican Republic. Id.

An area of contention between the parties
throughout the entire trial was the degree of connectedness between
Figueroa's organization and Torres' organization. The
government's witnesses identified overlaps between the two
organizations and portrayed the two organizations as part of one
overlapping conspiracy. For example, according to Marrero, the
drugs coming from the Dominican Republic were for both
organizations. Id. at pp. 61, 64-65. When the drugs arrived from
the Dominican Republic, they would be stored in a safe house and
then distributed to members of the various organizations. Id. at
pp. 41-42, 85. As Marrero explained in the following colloquy:

Q. What was the agreement between those two
organizations?

A. At one part, at a certain moment, we only
transported, but another point, the organizations
mixed and -- both organizations mixed in order to
import the drugs together and distribute them.

. . . .

> Q. Did everybody work in order to do the distribution of those kilos that were imported from the Dominican Republic?
>
> A. Not everybody, but a lot of people, yes.
>
> Q. Everybody that belonged to all those organizations?
>
> A. Correct.

See Docket No. 1539 at pp. 73-74. The leaders of the various organizations, including Figueroa and Torres, would agree on the prices at which the drugs would be sold. See Docket No. 1564 at p. 43. They would also collude to restrict supply and drive up the price. Id. And if a member of one organization needed additional drugs, he could borrow from another organization. Id. at pp. 42-43, 84-85, 123. Money returning to the Dominican Republic would be sent together and marked differently based on whether it came from Figueroa's organization, Torres' organization, or another organization. Id. at p. 39. Marrero also noted that if a person from one of the organizations was arrested and began to cooperate, he would be able to identify members of other organizations, too. Id. at pp. 40-41, 131.

By contrast, the defendants sought to characterize Figueroa's organization as separate from Torres' organization. During cross-examination, Marrero confirmed that Torres' organization and Figueroa's organization "were separate organizations, sometimes working in common." See Docket No. 1539

at p. 76.  And when Torres' organization sold drugs, Figueroa's organization did not profit from the sales.  Id. at p. 27.

Some of the defendants' attempts to paint the organizations as separate backfired.  In response to a question from a defense counsel about whether Figueroa, Torres, and others "were each one leaders of a separate organization," Marrero answered, "We worked all together."  Id. at p. 27.

Marrero discussed Collazo's criminal activity.  He testified that Collazo delivered money to the Dominican Republic as part of the drug trafficking and was paid a commission for the transportation.  See Docket No. 1564 at pp. 52-53.  In May 2009, for instance, Collazo delivered money in a private fishing boat that was roughly forty feet long.  Id. at pp. 52-53.  Afterwards, in June or July 2009, Marrero met with Collazo and others in the Dominican Republic at Torres' house for a dinner.  Id. at pp. 58-59.  And in September 2009, following an attempt on Figueroa's life in the Dominican Republic, Marrero helped another person to get money that came from drug trafficking to Collazo for it to be sent to the Dominican Republic.  Id. at pp. 65-66.  Collazo was paid upfront for transporting the money.  Id. at p. 70.  Collazo delivered the money.  Id. at p. 71.  Collazo also brought drug traffickers from the Dominican Republic to Puerto Rico.  Id. at p. 92.

Marrero also implicated Raymundi. Raymundi was at the shore on one occasion to help collect drugs transported by vessel from the Dominican Republic. Id. at pp. 74-75. On other occasions, too, Raymundi unloaded yawls with drugs and distributed drugs to others. Id. at pp. 75, 83, 87, 114-15. At some point, Raymundi was in charge of the group receiving the yawls at the shore. Id. at p. 87. Raymundi would also store drugs for Figueroa and Torres. Id. at p. 91. After a shipment arrived in Puerto Rico, Marrero would meet Raymundi and others at the home of an employee of Torres. Id. at p. 88. Varestín was at one of those meetings. Id. at p. 89.

Marrero testified that Varestín and Raymundi provided security for Torres and his house. Id. at pp. 89, 123; see Docket No. 1539 at p. 30. They always carried weapons. See Docket No. 1564 at p. 123. Varestín was paid for that work, at least sometimes, in drugs. See id. at p. 89. Marrero also testified that, in December 2009, Varestín accompanied Marrero and five others to the Dominican Republic. Id. at pp. 108-14. This was the only time Marrero saw Varestín in the Dominican Republic. See Docket No. 1539 at p. 31. Officials from the Dominican Republic and the United States interviewed the group and sent them back to Puerto Rico. See Docket No. 1564 at pp. 110-12.

In 2011, in a prior proceeding, Marrero pled guilty to crimes associated with drug trafficking.  Id. at p. 12.  He was criminally charged as the second-in-command of the drug trafficking organization led by Figueroa.  Id. at p. 11.  He was jailed in the same unit with Figueroa at various times between 2010 and 2016.  See Docket No. 1539 at p. 33; Docket No. 1564 at pp. 140-41.  Marrero was released from jail in February 2016, a few months before the trial in this case.  See Docket No. 1564 at p. 141.

Marrero began cooperating with the government in early 2011.  Id. at pp. 12-18.  He expected that the government would provide him a benefit if he provided substantial information to the government's efforts.  See Docket No. 1539 at p. 17. Marrero chose to cooperate because he wanted to change from a life of crime and because he wanted to get out of jail.  Id. at p. 28. Marrero met with law enforcement more than fifty times as part of his cooperation.  Id. at p. 18.  Before the trial in this case, as part of his cooperation, Marrero testified in several trials and grand jury proceedings against people that were involved in drug cases.  Id. at pp. 26, 51-52.  The government's sentencing recommendation was for a lesser amount of time in prison than Marrero could have faced based on the amount of drugs he trafficked and the charges brought against him.  Id. at pp. 21-22.  His

cooperation agreement, proffer letter, and related documents were
entered into evidence.  See id. at pp. 15-16; Docket No. 1564 at
pp. 12-16, 141-42.

     The defense sought to impugn Marrero's credibility.
They pointed out that when Marrero was detained in the Dominican
Republic in December 2009, all the information he gave to law
enforcement was false.  See Docket No. 1539 at p. 43.  Marrero
also stated under oath in an earlier judicial proceeding in the
United States that he used a fake identification in the Dominican
Republic on that trip because there were rumors that his apartment
was going to be seized, even though he testified at this trial
that he was in the Dominican Republic to kill a person there.  Id.
at pp. 45-46.  Additionally, the defense pointed out that, when
presented with a photograph, Marrero was unable to state whether
it was the marina where he alleged that drug trafficking conspiracy
events took place.  Id. at pp. 59-60.

     The defense also sought to draw out a motive for
why Marrero would testify against certain individuals, like
Varestín, who were alleged members of Torres' organization.  Torres
tried to kill Marrero.  Id. at p. 33.  And even though Marrero
continued with the syndicate, Torres and Marrero were enemies.
Id. at pp. 33-34.  By contrast, Figueroa was one of Marrero's best
friends.  Id. at p. 28.  Marrero helped Figueroa even after

Figueroa was in prison and Figueroa's organization was finished. Id. at p. 38.

During the trial, the prosecutors had an *ex parte* sidebar with Judge Pérez-Giménez concerning a six-page document with information about the persons against whom Figueroa would testify. See Docket No. 1528 at pp. 7–11. The document was prepared by Figueroa's attorney. Id. at pp. 9–10. The prosecutors asked Judge Pérez-Giménez "to make a determination if the matter should be a matter for disclosure in terms of any possible impeachment." Id. at p. 9. The prosecutors also wanted to know if the document would be protected by attorney-client privilege or work product privilege. Id. at pp. 8–10. The prosecutors told Judge Pérez-Giménez that Figueroa would not be called as a witness by the government. Id. at p. 8. Judge Pérez-Giménez doubted that the document would be protected by attorney-client privilege because it was provided to the government. Id. Judge Pérez-Giménez indicated that he would look at the document over the lunch recess, see id. at p. 10, but never ruled on whether it should be produced to the defense. Figueroa did not testify.

### 5. Víctor Gómez

Víctor Gómez, a seller of luxury automobiles, was the government's next witness. See Docket No. 1539 at pp. 78–79. He sold a Porsche automobile to Collazo for roughly $313,000. Id.

at pp. 80-85.  The car was paid for by cash and check.  Id. at pp. 84-92.  The Porsche automobile, however, was not delivered to Collazo.  Id. at pp. 92-93.

### 6.  Ricardo Mayoral

Ricardo Mayoral then testified for the government. Id. at pp. 97-98.  He is a special agent in charge of immigration and customs enforcement ("ICE") for Homeland Security Investigations ("HSI").  Id. at p. 98.  In September 2009, he interviewed Collazo and two others aboard a detained vessel.  Id. at pp. 99-102.  That vessel, the Olga, was flagged as part of an investigation.  Id. at p. 100.  The stories that Collazo and the two others told during the interview did not match.  See id. at pp. 104-06.  Those three were let go after the interviews.  Id. at p. 110.

### 7.  Damaris Boria-Pérez-Colón, Evelyn Montañez, Manuel Román-Santos, and Sandra Ríos-Carde

Afterwards, the government called four witnesses associated with an insurance broker.  The first two to testify were Damaris Boria-Pérez-Colón and Evelyn Montañez.  Id. at pp. 121-22, 131-32.  They worked accounts at the insurance broker associated with Collazo and his company, providing coverage for, inter alia, the Porsche automobile and the Olga vessel.  Id. at pp. 121-36.

Manuel Román-Santos, the chief financial officer of the insurance broker, also testified. <u>See</u> Docket No. 1539 at pp. 137-38. He explained that the insurance policy for the Porsche automobile was paid by checks made out by the chief executive officer of the insurance broker. <u>Id.</u> at pp. 141-44. This, of course, is not customary. <u>Id.</u> at p. 142. Manuel Román-Santos did not believe that the insurance CEO was involved in drug trafficking. <u>Id.</u> at p. 144. The insurance CEO had died by the time the trial took place. <u>Id.</u> at p. 145.

The next person to testify was Sandra Ríos-Carde. <u>Id.</u> She had been the executive secretary to the insurance CEO. <u>Id.</u> at pp. 145-46. She testified that Collazo and the insurance CEO were friends. <u>Id.</u> at p. 146. She did not, however, often see Collazo at the insurance CEO's office. <u>Id.</u> She explained that, at the time the checks were made out by the insurance CEO, Collazo delivered money in a brown paper bag to the insurance CEO. <u>Id.</u> at pp. 147-48. She did not often see Collazo or anyone else do this. <u>Id.</u> at pp. 148-49. She did not recall how the checks for the Porsche automobile were made out. <u>Id.</u> at p. 148.

### 8. Juan Clemente and Felipe Rivera-Rivera

Then, Juan Clemente testified. <u>Id.</u> at pp. 150. He is an HSI special agent. <u>Id.</u> In April 2009, he found cocaine in a shipping container. <u>Id.</u> at p. 152. The cocaine packages had

three different colors, suggesting it was for different organizations. Id. at p. 154. No arrests were made related to this cocaine. Id. Law enforcement surveilled individuals moving the container, but these individuals abandoned the container and law enforcement could not tie them to the narcotics in the container. Id. at pp. 155-56. Juan Clemente was not aware of DNA or fingerprints found on the shipping container or inside the drug packages. Id. at p. 166.

Felipe Rivera-Rivera was another witness for the government. See Docket No. 1531 at p. 24. His testimony related to the incident with the shipping container. See id. at p. 25. He is a Puerto Rico police officer assigned to work with federal law enforcement authorities. Id. at pp. 24-25. He explained that law enforcement allowed the containers to be moved so that surveillance could be done. Id. at p. 28. Some license plates of people going to the containers were recorded, but no one picked up the containers. Id. at pp. 28-32. Law enforcement then seized the containers. Id.

Juan Clemente also testified about the December 2009 incident in the Dominican Republic. See Docket No. 1539 at p. 156. Juan Clemente interviewed Varestín and six other individuals in the Dominican Republic. Id. at pp. 156-59. Juan Clemente went to the Dominican Republic because some members of

the group—but not Varestín—were flagged in Juan Clemente's computer system as being targets of an investigation. <u>Id.</u> at pp. 164-65. Varestín told Juan Clemente that the group was in the Dominican Republic for a vacation. <u>Id.</u> at pp. 159-60. Marrero was also part of that group; he used a false identification and gave false information. <u>Id.</u> at pp. 159, 162, 163-64, 168. The group went to the Dominican Republic in a vessel that was an investigation target. <u>Id.</u> at p. 162. After the interviews, the seven individuals were released, and the Dominican Republic authorities threw them out of the country because they did not have proper papers. <u>Id.</u> at pp. 165-66. When the group returned to Puerto Rico in their vessel, they were detained by American authorities. <u>Id.</u> at p. 166.

### 9. **José Rivera-Quiñones and Miguel Bermúdez**

The government's next two witnesses were José Rivera-Quiñones, a helicopter pilot working for the police of Puerto Rico, and Miguel Bermúdez, an HSI special agent. <u>See</u> Docket No. 1531 at pp. 9-10; Docket No. 1539 at pp. 169-70. In July 2008, José Rivera-Quiñones saw a yawl type vessel that had run aground. <u>See</u> Docket No. 1539 at pp. 170-71. The vessel had a blue tarp often used to conceal drug smuggling activities. <u>See</u> Docket No. 1531 at p. 12; Docket No. 1539 at pp. 171, 175. Together with other law enforcement officers, the two found 216 kilograms of

cocaine and cell phones in or around the vessel. <u>See</u> Docket
No. 1531 at pp. 14-15; Docket No. 1539 at pp. 173-74. A white
pickup truck fled the scene. <u>See</u> Docket No. 1539 at p. 172. No
arrests were made. <u>Id.</u> at p. 177.

### 10. José Ralat

Then José Ralat testified for the government. <u>See</u>
Docket No. 1531 at p. 32. He works for federal law enforcement
authorities. <u>Id.</u> at pp. 32-33. In November 2008, his unit,
including their canine, went to assist the Puerto Rico police to
search a vessel named Oceanic. <u>Id.</u> at pp. 34-37. The canine
alerted to the presence of narcotics. <u>Id.</u> at p. 35. Further
search of the vessel turned up cocaine and a semiautomatic firearm.
<u>Id.</u> at pp. 36, 39.

### 11. José Soto-Marcus and Víctor Salgado-Betancourt

José Soto-Marcus was the government's subsequent
witness. <u>Id.</u> at pp. 42-43. He is a Puerto Rico police officer
attached to the Drug Enforcement Administration ("DEA"). <u>Id.</u> at
p. 43. In January 2008, during surveillance, he stopped an
automobile that made two illegal turns. <u>Id.</u> at p. 44. Diego
Pérez-Colón ("Pérez-Colón") was driving the vehicle. <u>Id.</u> at p. 47.
José Soto-Marcus found money in the automobile. <u>Id.</u> at pp. 45-
46. Pérez-Colón kept changing his story about the source of the
money. <u>Id.</u> at pp. 47-50.

Víctor Salgado-Betancourt, the next government witness and another police officer attached to the DEA, also participated in the search of that vehicle. Id. at pp. 53–55. He found, in a hidden compartment, a firearm, marihuana, and notebooks with drug tallies. Id. at pp. 57, 60–61.

### 12. Diego Pérez-Colón

Diego Pérez-Colón then testified for the government. Id. at p. 64. He participated in Figueroa's drug trafficking activities beginning in 2005 until his arrest in 2010. Id. at pp. 64–66.

According to Pérez-Colón, Figueroa and Torres led separate drug trafficking organizations that were part of one syndicate. See id. at p. 89. The two groups would loan drugs to each other. Id. at p. 93. Pérez-Colón supplied drugs to individuals of both groups. See Docket No. 1534 at pp. 5–6, 9–12, 16. Pérez-Colón managed the drugs of both organizations. See id. at p. 20. Figueroa and Torres would also collaborate to withhold supply and drive up the price of the drugs. See Docket No. 1531 at pp. 94–95; Docket No. 1534 at pp. 6–11. They also agreed on the methods that drugs would reach Puerto Rico from the Dominican Republic. See Docket No. 1531 at p. 97.

Pérez-Colón explained that he worked with Varestín. Pérez-Colón knew Varestín since the beginning of 2009. Id. at

p. 82.  He met Varestín at a safe house.  See Docket No. 1534 at

p. 25.  They socialized together and knew each other well.  Id. at

pp. 64-66.  Pérez-Colón stated that Varestín was part of the seven-

member group arrested in the Dominican Republic in December 2009.

See Docket No. 1531 at pp. 80-82.  Pérez-Colón characterized

Varestín as a "trigger man."  Id. at p. 82.  At other times,

Varestín escorted Pérez-Colón when Pérez-Colón would receive and

move drugs.  See Docket No. 1534 at pp. 25-26.  Varestín carried

a firearm.  Id. at p. 26.

Pérez-Colón also explained that, beginning in 2009,

he worked with Raymundi to reconcile, collect, and distribute

drugs.  See Docket No. 1531 at p. 101.  Raymundi would hold the

drugs belonging to Torres, while Pérez-Colón would take charge of

the drugs belonging to Figueroa.  Id. at pp. 101-02.  This happened

five or six times.  Id. at p. 102.  Also, Pérez-Colón was with

Raymundi when he gave to boat captains weapons that were intended

for use in a killing in the Dominican Republic.  Id. at pp. 103-

04.  Raymundi was in charge of receiving the group going to the

Dominican Republic so that the group would be able to leave

quickly.  See Docket No. 1534 at pp. 23-24.

Pérez-Colón further described his activities with

Collazo.  Pérez-Colón stated that, after Figueroa was almost killed

in the Dominican Republic, he moved a few million dollars to

Collazo at Figueroa's direction so that Collazo could transport the money to the Dominican Republic. See Docket No. 1531 at p. 112. Pérez-Colón also brought money from Torres to Collazo. Id. at p. 113. In another incident, Pérez-Colón gave roughly two million dollars to Collazo because Torres was in the Dominican Republic and needed money. Id. at pp. 117–18. Collazo would then take the money to the Dominican Republic. See id. at p. 113. Pérez-Colón always showed the money to Collazo before turning it over to him. Id. at pp. 115, 118.

Pérez-Colón also testified that Martínez was an employee of one of the biggest drug distributors in Puerto Rico. Id. at pp. 122–23. Pérez-Colón dealt with Martínez on more than seven occasions exchanging drugs and money. See id. at pp. 123–26.

Pérez-Colón pled guilty to crimes associated with drug trafficking in 2011. Id. at p. 67. At the time he testified in this case he was serving a sentence for drug trafficking. Id. at p. 66. Pérez-Colón's plea agreement, plea supplement, 5K motion, and judgment were entered into evidence. See id. at pp. 67–68, 73; Docket No. 1534 at pp. 31-32.

Pérez-Colón began cooperating with the government in late 2010 or early 2011. See Docket No. 1531 at pp. 71–72. He

was interviewed by law enforcement agents many times.  Id. at p. 73.  He previously testified in trials.  Id. at p. 74.

As with Marrero, Varestín's trial strategy was to impeach Pérez-Colón's credibility.  In deciding to cooperate with the government, Pérez-Colón, Marrero, and Figueroa communicated in jail using illegal cellular phones.  See Docket No. 1534 at pp. 57–58.  Pérez-Colón pled guilty to crimes associated with lower quantities of drugs than he actually trafficked, and the government recommended a sentence at the lower end of the guideline sentence. Id. at p. 42.  The jury also heard that Pérez-Colón used weapons, bribed officials, and killed people, all of which were crimes with which he was not charged.  Id. at pp. 44–46.  Indeed, Pérez-Colón expected the government to recommend a reduction of his sentence based on his cooperation in this case.  Id. at p. 44.

Pérez-Colón was not always truthful with law enforcement.  For instance, when he was arrested in the Dominican Republic, half of the things Pérez-Colón said were lies.  Id. at pp. 74–75.

Varestín also argued that Pérez-Colón was incentivized to lie, and to testify against members of Torres' organization, because Pérez-Colón was part of the Figueroa organization.  Figueroa is like a father to Pérez-Colón.  Id. at p. 58.  Torres's employees kidnapped Pérez-Colón after he was

blamed for the loss of 585 kilos of cocaine.  Id. at pp. 62-63.

Pérez-Colón worried that Torres' employees were going to kill him

for this.  Id. at p. 63.  Pérez-Colón believed that Torres stole

the boat in which that cocaine had been stored, but this did not

provoke Pérez-Colón to testify against Torres.  Id. at p. 84.

Another defendant in this case, Martínez, also

sought to cast doubt on Pérez-Colón's testimony.  Pérez-Colón did

not remember who lived at Martínez's house.  Id. at p. 68.

Additionally, Martínez did not appear on Pérez-Colón's ledger of

people to whom he delivered drugs.  Id. at pp. 68-69.

### 13.  Joseph González

Joseph González followed Pérez-Colón on the witness

stand.  Id. at p. 86.  He is an FBI special agent.  Id. at p. 87.

Joseph González testified without objection that he

had source information that Varestín was providing security for

Torres.  Id. at pp. 116-17.  A text message between third parties

stated that Varestín would be going to Torres on a day that Torres

was worried about getting arrested.  Id. at pp. 96-97, 116-19.

That text message was admitted into evidence to prove its existence

but not for the truth of the matter asserted.  Id.

Joseph González was also part of the team that

seized the expensive Porsche automobile from Collazo.  Id. at

p. 123.  Collazo turned over the Porsche automobile to FBI custody.

Id.

Additionally, Joseph González testified that
Martínez was part of the Figueroa organization, and that he worked
in the drug trafficking trade.  See Docket No. 1537 at p. 51.

On cross-examination, Joseph González admitted that
that he did not develop any surveillance of Varestín.  See Docket
No. 1537 at p. 36.  Additionally, in a trove of data seized from
Torres, Joseph González never matched a phone number to Varestín,
though he also explained that the FBI did not dig deep enough to
determine definitively that there was no phone number for Varestín
in the trove.  See id. at pp. 36-39.

Joseph González further acknowledged that Martínez
did not show up in any of the phone records.  Id. at pp. 40-41.
Joseph González stated that the FBI never arrested Martínez with
drugs, money, firearms, and the like, but he could not speak for
other law enforcement agencies, and his memory of such details was
imperfect and would have to be refreshed.  Id. at pp. 41-46.

### 14.  Manuel Febo

The next government witness was Manuel Febo.  Id.
at p. 55.  He is a senior forensic chemist at a DEA laboratory.
Id. at p. 56.  He testified that he examined a substance which

arrived in Puerto Rico in a cargo container in April 2009 and found the substance to be cocaine.  Id. at p. 58.

### 15.  Ahmed Laboy

Ahmed Laboy testified next.  Id. at p. 64.  He is a service assistant within the Department of State of Puerto Rico. Id. at pp. 64–65.  He discussed business records for two companies associated with defendants in the case.  See id. at pp. 65–73.

### 16.  Rafael del Río-Rivera

The subsequent witness was Rafael del Río-Rivera. Id. at p. 75.  He is an office clerk at the Treasury Department of Puerto Rico.  Id. at p. 76.  He testified about Martínez's tax documents.  The documents indicate that Martínez worked as a mechanic in an auto parts business.  Id. at p. 80.  The documents also state that Martínez earned $3,800 in 2005, $3,400 in 2006, $10,980 in 2007, and was unemployed with no income from 2008 through 2010.  Id. at pp. 78–81.

### 17.  Arturo Cortés

Arturo Cortés then took the stand.  Id. at p. 83. He is the general manager of a car dealership.  Id. at pp. 83–84. He testified that, in June 2008, Martínez paid $10,000 in cash for a model year 2005 Chevrolet automobile.  Id. at pp. 84–90.

### 18. Diana Santiago-Figueroa

Diana Santiago-Figueroa was the government's next witness. Id. at p. 92. She is the director of inscription and numbering of vessels for the Puerto Rico Department of Natural and Environmental Resources. Id. She explained that Collazo originally registered the vessel named Olga. Id. at pp. 94-95. In 2001, ownership of that vessel was transferred to Erasmo Collazo and Olga Rivera. Id. at p. 95.

### 19. Jorge Figueroa-Agosto

The government's final witness was Jorge Figueroa-Agosto. Id. at p. 99. He is Figueroa's brother. Id. at p. 100. He admitted that he participated in drug trafficking activities with his brother. Id. at pp. 100-05.

According to Jorge Figueroa-Agosto, Torres was part of the drug trafficking syndicate too. Id. at pp. 107, 111. Jorge Figueroa-Agosto also confirmed something that Pérez-Colón had stated, namely, that Torres stole cocaine from the association. Id. at p. 118. Jorge Figueroa-Agosto stopped working in the association when he was afraid that Torres and others would kill him. Id. at p. 125.

Jorge Figueroa-Agosto testified that, once cocaine shipments came in, portions of the shipments were given to Martínez. Id. at pp. 112-13. Sometimes Martínez would pick up

the cocaine.  Id. at p. 122.  Cocaine was stored in Martínez's house.  Id. at p. 113.

Jorge Figueroa-Agosto pled guilty to importing and distributing cocaine.  Id. at p. 126.  He and his brother, along with Marrero and Pérez-Colón, decided to cooperate with law enforcement authorities.  See Docket No. 1547 at pp. 1-12.  He expected that his testimony in this case would lead the government to recommend a reduction in his sentence.  Id. at pp. 19-20.

## 20.  Stipulations

The parties agreed to a number of stipulations. Three DEA chemists would have testified that they determined that substances were cocaine.  Id. at pp. 29-33.  The substances in question were found on three occasions: on the vessel Oceanic, during a seizure in July 2008, and during a seizure in March 2009. Id.  Another stipulation stated that Martínez had no penal records and identified some of his educational certificates for automobile mechanic work.  Id. at pp. 33-34.  Finally, a witness would have testified concerning the tax records of Raymundi and Collazo.  Id. at pp. 34-39.

## 21.  Jayson Dávila-Reyes

Varestín then called Jayson Dávila-Reyes as a witness.  Id. at p. 58.  Jayson Dávila-Reyes was serving a sentence

at the time of his testimony and did not expect a reduction in his sentence because of his testimony.  See id. at p. 72.

Jayson Dávila-Reyes knew Pérez-Colón and Marrero. Id. at p. 64.  He spoke with Pérez-Colón while the two were imprisoned.  Id.  Pérez-Colón asked him to give false information to be used as testimony against other people and offered him money. Id. at pp. 65–66.  Pérez-Colón also asked about Varestín and Torres, apparently seeking information rather than fabricated testimony.  Id. at pp. 66, 68.  According to Jayson Dávila-Reyes, Figueroa asked Pérez-Colón and Marrero to testify against Torres, Varestín, and others in the Torres group.  Id. at p. 71.  Jayson Dávila-Reyes gave no information to Pérez-Colón abut Varestín, Torres, or the others.  Id. at p. 88.

Jayson Dávila-Reyes knew Varestín.  Id. at pp. 66–67.  He never saw Varestín with a gun, and never saw Varestín commit a violent criminal act.  Id. at p. 67.

## 22. Mario Rentería

The next witness for the defense was Mario Rentería.  Id. at p. 100.  He is an FBI special agent.  Id.

Mario Rentería interviewed Marrero and Pérez-Colón as part of the investigation in this case.  Id. at pp. 100–01. Mario Rentería did not record in his contemporaneous reports of those interviews that Pérez-Colón stated that Varestín escorted

cocaine from one house to another.    Id. at pp. 103-04.
Additionally, Mario Rentería did not record that Marrero stated
that he had an illegal phone in prison.  Id. at pp. 104-05.

### 23.  David Rivera-Rivera and Eliezer de Jesús

Varestín then called David Rivera-Rivera to the
witness stand.  See Docket No. 1563 at p. 7.  He is a refrigeration
technician.  Id.  He and Varestín were coworkers.  Id. at p. 14.

In December 2009, David Rivera-Rivera went to the
Dominican Republic with Varestín and five others.  Id. at pp. 8-
9, 14, 17-18.  They spent the first two days vacationing.  Id. at
p. 10.  The police questioned them on the third day to find out
the purpose of their trip.  Id. at p. 11.  United States agents
interviewed them the next day.  Id. at p. 12.  According to David
Rivera-Rivera, neither he nor Varestín knew why they were detained
by the police.  Id. at p. 37.  The group was then taken to their
boat to return to Puerto Rico.  Id. at p. 13.   The group was
intercepted by the Coast Guard on their way back.  Id.  During the
trip, David Rivera-Rivera did not see anyone with guns or drugs
and did not hear anyone talking about committing an illegal act.
Id. at p. 14.

Varestín's next witness was Eliezer de Jesús.  Id.
at p. 59.  During the time period in question in this case, he was
a refrigeration technician and Varestín's coworker.  Id. at p. 60.

Eliezer de Jesús and Varestín worked together on various jobs.  Id. at pp. 60–62.  Varestín was a very good worker. Id. at p. 62.  They typically worked together from 7:30 a.m. to 9:00 or 10:00 p.m. with breaks for meals.  See id.  They would also drive "four-tracks" together on Sundays.  Id. at p. 67.  He never saw Varestín with fancy cars, doing drugs, selling drugs, or carrying a weapon.  Id. at p. 63.  He does not know Varestín's friends.  Id. at p. 67.

### 24. Esmirna Negrón-Irlanda

The final witness in the case was Esmirna Negrón-Irlanda.  Id. at p. 70.  She is Martínez's mother.  Id.  To her knowledge, Martínez never used drugs, dealt drugs, or possessed drugs.  Id. at pp. 85–86.  She does not know someone by Pérez-Colón's name.  Id. at p. 71.  Between 2005 and 2009, Martínez did not own expensive property or cars, and did not have a big bank account.  Id. at pp. 74–75.  In 2008, Martínez bought a used Chevrolet automobile.  Id. at pp. 79–80.  At the time the car was purchased, Esmirna Negrón-Irlanda and her husband (Martínez's father) gave Martínez $5000 when they closed their business due to the husband's illness.  Id. at pp. 80–81.  Martínez had worked in that business as a mechanic.  Id. at pp. 77–78.

### 25. Closing Arguments

The attorneys then presented closing arguments. The government argued that Figueroa, Torres, and others were part of an overarching conspiracy or organization. See Docket No. 1628 at p. 20. In the government's view, the evidence showed that Varestín was an armed bodyguard for Torres and helped protect drugs and money; that Martínez received and sorted drugs; that Collazo delivered money to Figueroa on behalf of the organization in his vessel; and that Raymundi received drugs in the waters of Puerto Rico and gave the drugs to other members of the organization. Id. at p. 19.

Varestín's trial strategy, as evidenced in his closing argument, was to impeach Pérez-Colón's and Marrero's credibility. Id. at pp. 34-45. Varestín pointed out that Pérez-Colón and Marrero testified in this case and other cases pursuant to cooperation agreements for which they expected benefits. Id. He also argued that Pérez-Colón and Marrero were incentivized to lie because they had been part of the Figueroa organization and not the Torres organization. Id. at pp. 36-37.

Varestín contrasted Pérez-Colón and Marrero with Jayson Dávila-Reyes. Id. at pp. 35-36. Varestín argued that the latter should be believed because he did not have a reason to lie.

Id. Varestín also pointed out Jayson Dávila-Reyes' testimony that he was asked by Pérez-Colón to lie but chose not to. Id.

Varestín further argued that the testimony that Pérez-Colón and Marrero against him was insufficient. Id. at pp. 36-38. Varestín asserted that he never went to the Dominican Republic to provide protection for Torres, and that the December 2009 trip to the Dominican Republic was, according to David Rivera-Rivera, only a pleasure trip. Id. at pp. 37-38. Additionally, Varestín noted that Pérez-Colón's and Marrero's testimonies were not corroborated by surveillance, undercover agents, wiretaps, fingerprints, DNA, or communication records. Id. at p. 38.

Finally, Varestín contended that the only evidence offered against him was the testimony of Pérez-Colón and Marrero. Id. at pp. 38-45. He noted that apart from those two, the only other witnesses to mention him were Joseph González, Mario Rentería, Jayson Dávila-Reyes, and Varestín's former colleagues. Joseph González, Varestín contended, could only present a single text message between two third parties discussing Varestín without any mention of criminal activity. Id. at p. 39. Meanwhile, Varestín stated that Mario Rentería never recorded in his notes of his interview with Pérez-Colón that Pérez-Colón had hired Varestín as an escort. Id. at pp. 39-40. And he highlighted that

Varestín's former colleagues stated that he worked hard and never saw him engaged in criminal activity. See id. at pp. 40-41.

The closing arguments for Martínez, Collazo, and Raymundi came next. Id. at pp. 45-73. These arguments generally asked the jury to acquit the defendants because of witness credibility issues and a lack of corroborating evidence. See id.

### 26. Jury Verdict

On July 22, 2016, the jury found the defendants guilty of various offenses. See Docket Nos. 1583-86. All of the defendants were found guilty of conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. section 846. See id. Three defendants were found not guilty—Varestín, Martínez, and Collazo—and one defendant was found guilty—Raymundi—of conspiracy to import controlled substances in violation of 21 U.S.C. sections 952 and 963. See id. Additionally, Collazo was found guilty of conspiracy to commit money laundering and international money laundering in violation of 18 U.S.C. section 1956. See Docket No. 1585.

### B. Varestín's Counsel Learns that Pérez-Colón and Marrero May Be Cooperating with the Government in Another Case

According to the motion papers and related filings before the Court, Carlos Ochoa-Rocafort ("Ochoa") was a prison guard. See Docket No. 1983 at p. 6. He worked in New York during

the beginning of the 2010s. _Id._ He was investigated for corruption concerning his 2012 activities in New York. _Id._ at p. 9. In 2015, he was transferred to Puerto Rico. _Id._ at p. 6.

In Puerto Rico, Ochoa worked as a prison guard for a year before Varestín's trial in the area where Pérez-Colón and Figueroa were imprisoned. _See id._ at pp. 8-9. The three planned and committed criminal acts. _Id._ at pp. 9-10. Ochoa was indicted and arrested in February 2017. _See_ Docket No. 1979 at p. 4.

Varestín's counsel was appointed to represent Ochoa. Brief for Appellant at 37, _United States v. Varestín-Cruz_, Nos. 17-1314, 18-1076, 18-1528 (1st Cir. Oct. 24, 2018) [hereinafter Varestín Appellate Brief]. As that representation commenced, Ochoa told his appointed counsel that Pérez-Colón, Marrero, and/or Figueroa cooperated with the government in an investigation concerning Ochoa. _Id._; _see_ Docket No. 1979 at p. 4; Docket No. 1983 at p. 6.

### C.    Defendants' Post-Trial Proceedings

At Varestín's sentencing hearing on March 14, 2017, his defense counsel adverted to a _Brady_ issue. _See_ Docket No. 1784 at p. 2; _see also Brady_, 373 U.S. 83. Counsel argued that, according to his information, Pérez-Colón or Marrero were working as confidential informants for the government. _See_ Docket No. 1784 at p. 2. He noted that the defense had requested the government

to confirm whether and when each witness became a confidential
source, but the prosecutor had been unable to communicate with a
colleague and a response had not been provided. Id. The defense
asked Judge Pérez-Giménez to order the government to state whether
either witness was a confidential source during the time that
Varestín's trial was proceeding. Id. at pp. 3-4. If either Pérez-
Colón or Marrero was indeed a confidential source, the defense
asked Judge Pérez-Giménez to also order the government to identify
their associated agreement, remuneration, and benefits; whether
the witness provided truthful information at all times; whether
the witnesses' information was corroborated or not trustworthy;
and anything that might go toward the witnesses' credibility. Id.
at p. 4.

        The government responded at the hearing that, so far as
it was aware, it complied with all discovery obligations up until
the trial date. Id. at p. 6. The government also confirmed the
inability to communicate with the other prosecutor. Id. at pp. 6-
7.

        Varestín's counsel offered to file a formal motion. Id.
at p. 3. Judge Pérez-Giménez noted his amenability to that
approach. Id.

        Six months later, on September 14, 2017, Varestín's
counsel filed his motion. See Docket No. 1813. The short motion

simply stated that counsel had information that Pérez-Colón and

Marrero were confidential informants at the time they testified or

thereafter and requested an order directing the government

> to answer if the above[-]named cooperators were
> confidential informants at the time they testified, or
> at anytime [*sic*] prior or after, and if so, produce a
> copy of the confidential informant file for each of them.
> If they were not confidential informants, when did
> discussions or negotiations to become [confidential
> informants] start.

Id. at p. 1.  The motion also noted that the government had still

not responded to the defense request.   Id.

        Martínez, Collazo, and Raymundi moved to join Varestín's

motion.   See Docket Nos. 1821, 1832, 1838.

        The government responded.   See Docket No. 1818.   The

government argued that Varestín's request was "made without a *prima*

*facie* showing of relevance, particularly, at this juncture of the

criminal matter."   Id. at p. 2.   The government also contended

that the district court no longer had jurisdiction over the matter

because Varestín had filed an appeal.   Id.

        In his reply, Varestín argued that judicial precedent

imposed an ongoing duty to disclose exculpatory and impeaching

materials.   See Docket No. 1837 at pp. 1–4.  Varestín also argued

that the information was material because the only evidence offered

against him was the testimony of the two witnesses and his defense

strategy was to impeach their credibility.   Id. at pp. 4–5.

Judge Pérez-Giménez denied Varestín's motion "[u]pon receiving the [government's] answer" in Docket No. 1818. <u>See</u> Docket No. 1939. He noted and held moot the joinder motions from Martínez, Collazo, and Raymundi. <u>See</u> Docket Nos. 1840-42.

Varestín then filed two motions. One motion, filed *ex parte*, asked Judge Pérez-Giménez to reconsider his decision and to compel to government. <u>See</u> Docket No. 1847. The other motion requested an order for information associated with Pérez-Colón, Marrero, and Figueroa. <u>See</u> Docket No. 1851. Martínez moved to join Varestín's second motion. <u>See</u> Docket No. 1853.

Judge Pérez-Giménez denied Varestín's first motion and found the second motion to be moot. <u>See</u> Docket No. 1879, 1881. He also noted Martínez's motion to join Varestín's second motion. <u>See</u> Docket No. 1924.

### D.  **Appellate Proceedings**

On appeal, Varestín raised the issue of the exculpatory and impeaching evidence. Varestín Appellate Brief at 37-38, 83-95. With respect to Pérez-Colón's and Marrero's cooperation in the Ochoa investigation, Varestín argued that associated information was not disclosed to the defense, that he exercised due diligence to obtain the information, and that the evidence creates a reasonable probability of a different result because it would have supported his attempt to impeach Pérez-Colón's and

Marrero's credibility.  Id. at 88-91, 93-95.  He also pointed to
the six-page document with possible impeachment material that was
not produced to the defense during trial.  Id. at pp. 92-93.

The government moved for a limited remand of the Brady
issue.  Appellee's Motion for a Limited Remand, United States v.
Varestín-Cruz, Nos. 17-1314, 18-1076, 18-1528 (1st Cir. Feb. 15,
2019).  The government asked for the remand "to allow the court
and the parties to develop the record and for the district court
to make factual findings and conclusions of law."  Id. at p. 2.
The government suggested that the district court could take up the
issues associated with Pérez-Colón and Marrero as well as the six-
page document.  Id. at pp. 6-7 & 6 n.3.

Varestín opposed the limited remand.  Appellant's
Opposition to Motion for a Limited Remand, United States v.
Varestín-Cruz, Nos. 17-1314, 18-1076, 18-1528 (1st Cir. Feb. 15,
2019).

In December 2019, the First Circuit Court of Appeals
ordered a limited remand of the cases against the defendants.  See
Docket No. 1965.  The order stated,

> Since the record is insufficient to determine whether
> the Government violated its disclosure obligations under
> Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v.
> United States, 405 U.S. 150 (1972), we grant the parties'
> motions for limited remand to the district court for a
> swift resolution of the issue.  We retain jurisdiction
> over these appeals in this process.  Because of the

nature of the claims at issue, it is our judgment that
the matter be referred to a different judge on this
limited remand to the district court.

Id.

## II.   Parties' Positions

### A.   Defendants' Original Motion

Varestín states that he has information that Pérez-Colón

and Marrero "were confidential informants at the time they

testified, or thereafter, OR, that they were party [sic] to

undisclosed cooperation agreements, benefits, or were otherwise

the source of information provided to the Government." See Docket

No. 1967 at p. 1.  This information, Varestín avers, "was never

disclosed prior to trial or during trial, nor after trial."  Id.

Varestín moves the Court to order the government to state

whether Pérez-Colón and Marrero were confidential informants at

any time before, during, or after trial.  Id. at p. 2.  If either

were a confidential informant, Varestín also asks the Court to

compel production of the associated confidential informant file in

a manner that is not redacted, and which identifies any undisclosed

benefit, agreement or statement.  Id.

Varestín also requests a hearing "to determine why the

Government has failed to comply with the continuing obligation to

disclose said information."  Id.  Additionally, to determine why

the information was withheld, Varestín wants to take depositions before the hearing or call witnesses at the hearing.  Id.

Finally, Varestín asks the Court to compel production of the six-page document which the government presented to Judge Pérez-Giménez during an *ex parte* sidebar and which was never produced to the defense.  Id.

Martínez, Collazo, and Raymundi moved to join Varestín's motion without any additional argument.  See Docket Nos. 1987-92.

**B.  Government's Response**

The government requests that the Court deny the defendants' motion.  See Docket No. 1979 at p. 1.  The government offers a few bases for denial.

One argument made by the government rests on the timeline.  The FBI investigation into Ochoa, the government explains, was opened in August 2016 after defendants' trial.  Id. at p. 3.  The government thus concludes that "it is an impossibility that any of the information provided by [Pérez-Colón] to law enforcement about Ochoa could have affected the trial or the cross-examination of [Pérez-Colón].  It is impossible because it did not exist at the time of the defendants' trial in this case."  Id. at p. 4.  And, the government adds, because the cooperation occurred after the trial, it could not have been constructively in the prosecutor's possession.  Id. at p. 5.

The government also avers that Marrero and Pérez-Colón were not confidential informants. The government acknowledges that Pérez-Colón did receive illegal telephones from Ochoa while in prison and did make phone calls to Ochoa in December 2016 after leaving prison, but "[Pérez-Colón] was never paid any money for this from any law enforcement agency, was not signed up as a confidential source, and received no benefit for his assistance in the investigation into Ochoa." Id. at p. 4. Meanwhile, Marrero "never had any involvement in the prosecution or investigation of Ochoa." Id. at p. 3.

In support of its point that Marrero and Pérez-Colón were not confidential informants, the government attached to its response a number of affidavits and statements. "The government has contacted all federal law enforcement agencies that had any contact with anyone involved in this case and at no time were [sic] either witness confidential informants for the government." Id. at p. 1 n.1. A statement by an agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") states that, after conducting a search related to Pérez-Colón, Marrero, and Figueroa, the bureau

> determined that none of these individuals have [sic] had
> a signed confidential informant agreement with ATF. One
> or all of these individuals may have provided
> information to ATF but were ultimately not utilized by
> ATF in a manner that would have required them being
> registered as ATF confidential informants. ATF policy
> does not require cooperating defendants merely providing
> information to be registered as such.

Id., Ex. 1 at p. 1. An affidavit by an individual at the FBI

states that, after a search, there was no record of Pérez-Colón,

Marrero, or Figueroa "ever having been open as a [confidential

human source], or having entered into any cooperation agreement

directly with the FBI." Id., Ex. 2 at pp. 1-2. The records also

indicated "that no one-time payments were made to, nor any other

financial benefit conferred on, any of the individuals." Id.,

Ex. 2 at p. 2. Finally, a statement from an ICE agent informs

that "a search within the [HSI] confidential informants' database,

disclosed no records of [Pérez-Colón, Marrero, and Figueroa] ever

being documented as HSI confidential informants." Id., Ex. 3 at

p. 1.

        Additionally, the government contends that a new trial

for defendants is not warranted even if it had a duty to disclose

post-trial cooperation. Id. at p. 6. The government indicates

that newly discovered evidence that is merely impeaching normally

cannot form the basis for a new trial, and Pérez-Colón's post-

trial assistance would have had little value. Id.

The government further points to deficiencies in the defendants' motion. According to the government, "[t]he defense has never provided any information to the government, besides what is contained in their *ex parte* motion filed on December 4, 2017, to demonstrate that the witnesses were also confidential informants." Id. at p. 1 n.1. The government further states that "[t]o date, no counsel has provided any information regarding the details of the defense investigation and has merely asserted that the privileged conversations between Ochoa and counsel for Varestín form the basis of the assertion that [Pérez-Colón] was a confidential informant during the time that he testified." Id. at p. 5 n.4.

Finally, the government discusses the six-page document presented to Judge Pérez-Giménez during an *ex parte* sidebar at the trial and never produced to the defense. The government notes that "[t]he entire case file (which was previously housed at the records center) has been requested and the government will supplement the record if and when it locates the 6-page document." Id. at p. 2 n.2.

## C.  Varestín's Reply

Varestín replied to the government's response. See Docket No. 1983. His reply tries both to narrow and broaden his original motion in different respects. The reply also unspools a

host of threads that he wants this Court to help him pull.
Unfortunately, the reply tangles the threads in a jumbled mess
(and the original motion does not even dangle them).  The Court
has made a determined effort to unknot the reply in an effort to
understand what Varestín is seeking.

Varestín narrows the temporal period of conduct with
which he is interested.  He now says that "it is the cooperators'
conduct before and during trial that the defense is seeking."  Id.
at p. 8.

But Varestín also broadens his original motion by
seeking more information than was expressly desired in the original
motion.  Varestín acknowledges that, in its response, the
government states that Pérez-Colón and Marrero were not
confidential informants in the Ochoa investigation.  Id. at p. 7.
"[T]his does not end the Court's inquiry," Varestín now says,
because "the Government's duty of disclosure encompasses all
impeachment evidence that bears on its witnesses, including
information that tends to show bias," "[t]he issue is whether there
is undisclosed information indicating bias on the part of [Pérez-
Colón and Marrero]," and "[e]ngagement with law enforcement in an
active investigation is precisely that."  Id. at pp. 1, 8.  He
clarifies that he is seeking all information pertaining to Pérez-
Colón's and Marrero's work with law enforcement on other cases,

including the investigation into Ochoa. _Id._ at pp. 1-2. Varestín

also wants information on the relationship between Figueroa,

Pérez-Colón, and Marrero, as well as their work together assisting

law enforcement. _Id._ Varestín emphasizes that his request seeks

more than mere signed agreements; he explains that it includes

information relating to any promise, benefit, or implicit

agreement with the government or a government agency. _Id._

Varestín also emphasizes that "this Court must inquire into the

circumstances and conduct concerning [Pérez-Colón, Marrero,

Figueroa, Ochoa,] law enforcement, and the Government in order to

determine if the circumstances indicate either a benefit or the

cooperators' perception that they could expect a benefit." _Id._ at

p. 13.

    With this broader request, Varestín takes issue with

affidavits submitted by the government. _Id._ at p. 3. Varestín

asserts that the affidavits "are so particular in their language

and assertions that they do not resolve the issue on remand." _Id._

He notes that the affidavits leave open the broader question of

whether Pérez-Colón or Marrero provided information in exchange

for a perceived benefit because the affidavits merely state that

the cooperators were either not registered as confidential

informants or did not enter into cooperation agreements. _Id._ at

pp. 21-22. Varestín also observes that the government provides no

affidavit or other information from the Office of the Inspector General, the Bureau of Prisons, or the United States Marshals Service, all of which, according to Varestín, were responsible for investigating Ochoa.  Id. at p. 3.

Clearly, Varestín believes there might be undisclosed Brady or Giglio material related to the Ochoa investigation.  His reasons for thinking so, however, are tenuous.  Varestín notes that on October 28, 2016, an FBI agent "informed that a source, either [Pérez-Colón] or [Figueroa], had inculpatory conversations with Ochoa 'nine months ago.'"  Id. at p. 8.  According to Varestín, this "demonstrat[es] that their work on the Ochoa case was ongoing in January of 2016," seven months before Varestín's trial.  Id.  Varestín contends,

> To the extent that this contact [of Pérez-Colón and Figueroa] with Ochoa was on behalf of law enforcement, or was communicated to law enforcement, or was the result of agreement with or direction by [Figueroa], or resulted in any explicit, implicit, or reasonably relied upon expectation of a benefit, it is Giglio material.

Id. at p. 9.  Varestín also points out that Pérez-Colón phoned Ochoa on the day he left prison in December 2016.  Id. at pp. 20–21.  To Varestín, this suggests that there was a tacit agreement with law enforcement, or at least logistical arrangements, prior to December 2016.  Id. at pp. 20–21.

Varestín also states that he wants information relating to Pérez-Colón, Marrero, and Figueroa in other investigations and cases. He says that the Ochoa investigation is an "example" of those persons' cooperation that he is seeking. Id. at pp. 14, 22–23. Varestín claims that "[a]ny relationship that [Pérez-Colón, Marrero and Figueroa] had with law enforcement, beyond that which was presented against [Varestín] at trial, is Giglio material to the extent that it demonstrates they were involved in other target investigations." Id. at p. 16. Varestín also says that "the classification or status of [Pérez-Colón, Marrero and Figueroa] is also relevant to this Court's present inquiry." Id.

Varestín further thinks Brady material could show up in other ways. Varestín states that the government knew Ochoa was corrupt before he was transferred to Puerto Rico because of the public bribery and corruption charges against Ochoa for actions in New York in 2012. Id. at p. 9. Varestín also claims that the government's investigation into Ochoa began earlier than 2016. Id. at pp. 9–10. From those assertions, Varestín also demands that "this Court must also inquire into whether Ochoa was purposefully placed [in the same prison area as Figueroa and Pérez-Colón] to give [Figueroa and Pérez-Colón] the opportunity to gather information and recruit him, and must order the Government to produce the corresponding information." Id. at p. 10.

Additionally, Varestín highlights the six-page document presented to Judge Pérez-Giménez. Id. at p. 3. He notes that the document still has not been produced to the defense. Id. He asserts that this document alone appears to substantiate a Giglio violation because the prosecutor thought the document contained "possible impeachment" material and Judge Pérez-Giménez disagreed with the government that the material was protected by attorney-client privilege. Id. at p. 3 n.1. Varestín says that the government's promise to produce the document "if and when it locates the 6-page document" is unresponsive to the issue on remand and "woefully insufficient." Id. at p. 3 & n.1.

Varestín portrays these undisclosed materials as reasonably likely to have affected the outcome of the trial. He notes that the cooperators' bias was a central defense strategy. Id. at pp. 13–14. These materials could have helped him show, he says, that the cooperation was "ongoing and far-reaching . . . in other cases" and dispel "the impression that [Pérez-Colón's and Marrero's] sole motive to lie was to receive a singular benefit in return for their trial testimony in [Varestín's] case." Id. at p. 14. Varestín also argues that the materials would have "support[ed] the defense theory that the cooperating witnesses coordinated their information in order to corroborate and

reinforce each other's testimony, thereby enhancing each other's benefits." Id.

Varestín disputes the significance of his failure to provide documentary evidence in support of his demand for undisclosed Brady and Giglio material. Id. at pp. 3-4. He notes that the government has an affirmative duty to inquire about and produce Brady and Giglio material. Id. at p. 4. To Varestín, "[i]t would be absurd for the defense to shoulder this burden because the documents, information, and evidence at issue are in the sole possession and control of the Government, and much of it is sealed, confidential, or internal law enforcement correspondence." Id. Varestín objects to what he sees as an attempt by the government to shift its burden to him. Id.

Varestín closes his reply with a sprawling, non-exhaustive list of fifteen types of information for which he seeks an order to compel production. He wants "[t]he complete unredacted files on the [Ochoa] prosecutions," "[a]ny case transfer document . . . regarding [Ochoa], "[a]ny case initiation document . . . regarding the decision to investigate [Ochoa] in Puerto Rico," any document or evidence regarding the investigation of Ochoa and the decision to transfer him to Puerto Rico, "[a]ny communication between law enforcement in Puerto Rico and law enforcement in New York regarding [Ochoa], and communications with

Pérez-Colón, Marrero, or Figueroa." Id. at pp. 22-24. He further

desires "[a]ny documents [sic] . . . regarding [Pérez-Colón],"

including documents associated with his prison location, documents

concerning his contact with Figueroa and law enforcement, and

documents in furtherance of any benefit for cooperation. Id. at

pp. 23-24. He wants similar information for Marrero. Id. And

Varestín asks for "[a]ny and all information relating to the

'anonymous tip' regarding [Ochoa's] vehicle." Id. at p. 24.

Finally, Varestín solicits documents concerning Pérez-Colón's,

Marrero's, and Figueroa's criminal conduct while detained or

imprisoned, including production of any authorization for Pérez-

Colón and Figueroa to engage in illegal activities or, if no such

authorization exists, a negative certification and explanation.

Id. at pp. 19, 24-25.

**D.   The Government's Surreply**

The government's surreply argues that the defense

misunderstands its position. See Docket No. 1996 at p. 5. The

government acknowledges the defense emphasis that cooperation is

subject to disclosure even if there was no formal agreement. Id.

But the government argues that this misses the point because "[t]he

government's position is that the witnesses were not participating

in the Ochoa investigation at the time of trial because it didn't

exist." Id.

The government provided further support for the notion that the Ochoa investigation, and Pérez-Colón's involvement in that investigation, began after the defendants' trial. The Ochoa investigation began on August 8, 2016 and, at that time, "no one from the [FBI] or the Bureau of Prisons had conducted any interviews or had any conversations with [Pérez-Colón] regarding [Ochoa] prior to this date." Id. at p. 2.

The government also rejects the argument that it was aware of any investigation into Ochoa for his 2012 activities in New York. "[N]o one from the FBI in Puerto Rico – let alone the prosecution team – was aware of any pending investigation into [Ochoa] for corruption that occurred in New York at the time of the trial in this case." Id. at p. 2.

The government also dismisses the defense's reliance on the FBI's October 2016 statement that a source had inculpatory conversations with Ochoa nine months prior to October 2016. Id. at p. 3. The government observes that nothing about that statement suggests that the contact nine months prior to October 2016 was on behalf of law enforcement. Id.

The government likewise rejects the relevance of an anonymous tip made to Puerto Rico police on July 12, 2016. Id. at p. 2. The government explains that it knows no connection between the anonymous tip and either Pérez-Colón or Figueroa. Id. at

pp. 2-3.    The government also notes that it first received paperwork associated with the tip in October 2016, and attaches supporting documentation.  Id. at p. 3; Exhs. 2-3.  The government states that, in any case, given the defense theory that Pérez-Colón and Figueroa were cooperating with federal authorities in the hopes of receiving a benefit, it would make no sense for them to make an anonymous tip.  Id. at p. 3.

## III. Applicable Law

### A.    Evidentiary Hearing

"'[E]videntiary hearings on new trial motions in criminal cases are the exception rather than the rule.'"  Peake, 874 F.3d at 72 (quoting Connolly, 504 F.3d at 220).  New trial motions in criminal cases "ordinarily are decided on the basis of affidavits, without convening evidentiary hearings" and "[e]ven disputed matters of fact arising from post-trial motions 'are often properly decided on the basis of affidavits.'"  Connolly, 504 F.3d at 220 (quoting United States v. Abou-Saada, 785 F.2d 1, 6 (1st Cir. 1986)).

Trial courts have discretion on whether to grant a request for an evidentiary hearing.  Colón-Muñoz, 318 F.3d at 358.  "'[A] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion.'"

Id. (alteration in original) (quoting United States v. Panitz, 907
F.2d 1267, 1273 (1st Cir. 1990)).

        The First Circuit Court of Appeals has repeatedly stated
that, to merit an evidentiary hearing on a motion for a new
criminal trial, a defendant must make a sufficient threshold
showing that material facts are in doubt or in dispute. See, e.g.,
Connolly, 504 F.3d at 219-20; Colón-Muñoz, 318 F.3d at 358-60; see
also United States v. Denunzio, 123 F. Supp. 3d 135, 145 (D. Mass.
2015). "In pursuing this inquiry, the court must make a practical,
commonsense evaluation." Connolly, 504 F.3d at 219. If a motion
for a new criminal trial "is 'conclusively refuted . . . by the
files and records of the case,' an evidentiary hearing would be
supererogatory." Id. at 219-20 (alteration in original) (quoting
United States v. Carbone, 880 F.2d 1500, 1502 (1st Cir. 1989));
see Peake, 874 F.3d at 72.

        It appears that this standard—sufficient threshold
showing of material facts in doubt or dispute—is the proper
standard to apply here. Although the First Circuit Court of
Appeals has stated that "[t]he precise standard to be met to
warrant a post-trial evidentiary hearing on an alleged Brady
violation has not been decided," Colón-Muñoz, 318 F.3d at 360 n.6,
the court has applied the standard in cases involving Brady
challenges, see, e.g., Connolly, 504 F.3d at 219-20; Colón-Muñoz,

318 F.3d at 358-60.  In any case, the applicable standard "is certainly more than a mere 'colorable claim.'"  Colón-Muñoz, 318 F.3d at 360 n.6.

### B.  **Brady** and **Giglio** Claims

In Brady, 373 U.S. at 86, the Supreme Court held that a prosecutor's failure to disclose exculpatory evidence violates due process.  As the Supreme Court later explained,

> The Brady rule is based on the requirement of due process.  Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.  Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . .

United States v. Bagley, 473 U.S. 667, 675 (1985) (footnotes omitted).  In Giglio, 405 U.S. at 153-54, the Supreme Court held that material impeachment information is encompassed within the Brady rule.

The burden to establish a Brady violation rests with the criminal defendant, not the government.  Douglas v. Workman, 560 F.3d 1156, 1173 (10th Cir. 2009); 3 Charles Alan Wright & Sarah N. Welling, Federal Practice and Procedure: Criminal § 586, at 488 (4th ed. 2011) [hereinafter Wright & Welling].  This is so even though the government has an affirmative duty pursuant to Brady to disclose evidence.  Wright & Welling, § 586, at 488.  And to meet

that burden, a defendant cannot merely rely on speculation.  United

States v. Jumah, 599 F.3d 799, 809 (7th Cir. 2010).

The requirements of a Brady claim have evolved over the

decades.   See 6 Wayne R. LaFave et al., Criminal Procedure

§ 24.3(b), at 418-29 (4th ed. 2015) [hereinafter LaFave]

(summarizing the history).  The "three components of a true Brady

violation" are (i) suppression by the government of (ii)

exculpatory or impeaching evidence favorable to the defense where

(iii) "prejudice . . . ensued."   Strickler, 527 U.S. at 281-82;

see also Colón-Muñoz, 318 F.3d at 359 (discussing Strickler); see

also Peake, 874 F.3d at 69 (internal quotation marks omitted)

(explaining that a defendant must show "that the specified evidence

was unknown or unavailable to him at the time of trial; that the

failure to discover such evidence was not the result of his lack

of diligence;" and prejudice).

The third condition—prejudice—focuses on the fairness of

the proceeding.   Prejudice is shown where there is a reasonable

probability that the result of the proceeding would have been

different had the evidence been disclosed.  Cone, 556 U.S. at 469-

70; Strickler, 527 U.S. at 280; see Peake, 874 F.3d at 69.   In

other words, to satisfy the third element, "the defendant need

only point to something sufficient to undermine confidence in the

outcome of the trial."  Peake, 874 F.3d at 69 (internal quotation

marks and alteration omitted).  Thus, the third element imposes a lesser burden on a defendant than the standard ordinarily applied in a motion for a new trial—actual probability of a different result.  Id.  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995).

The burden imposed by the third element bears further emphasis.  It "is not a sufficiency of evidence test" and "once a reviewing court . . . has found constitutional error there is no need for further harmless-error review."  Id. at 434–35. Additionally, prejudice is judged "in terms of suppressed evidence considered collectively, not item by item."  Id. at 436.

Withheld impeachment evidence does not easily pass the threshold for showing prejudice.  "The nondisclosure cases finding materiality in impeachment material generally have dealt with obviously significant impeachment material otherwise known to the prosecutor," like a promise to compensate the witness.  LaFave, § 24.3(b), at 433.  Or, if a witness states that he needs to be hypnotized to truly recall pertinent events, failure to disclose this evidence would pass the threshold.  Conley v. United States, 415 F.3d 183, 189–91 (1st Cir. 2005).

Withheld evidence may be more material where it would impeach the credibility of the prosecution's key witness or witnesses. "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the Brady rule justifying a new trial]." Giglio, 405 U.S. at 154 (internal quotation marks omitted). In Banks v. Dretke, 540 U.S. 668, 700 (2004), withheld impeachment evidence was material because it would have undermined a "crucial" witness's testimony. Similarly, in Smith v. Cain, 565 U.S. 73, 76 (2012), withheld evidence was material where it directly contradicted the trial testimony of the only witness connecting a defendant to the crime.

At the same time, the materiality of evidence suffers if "other types of impeachment material [were] available to attack credibility, and . . . the withheld material was only cumulative of other impeaching evidence." 2 Charles Alan Wright & Peter J. Henning, Federal Practice and Procedure: Criminal § 256, at 152 (4th ed. 2009) [hereinafter Wright & Henning]. "Generally, where impeachment evidence is merely cumulative and thereby has no reasonable probability of affecting the result of trial, it does not violate the Brady requirement." United States v. Dweck, 913 F.2d 365, 371 (7th Cir. 1990). "[I]mpeachment evidence is not material if it is cumulative of evidence of bias or partiality

already presented and thus would have provided only marginal additional support for the defense." United States v. Parker, 790 F.3d 550, 558 (4th Cir. 2015) (internal quotation marks omitted). For example, in a case where a witness admitted to preparing hundreds of appraisals with false statements, a withheld admission that she also prepared loan applications with false statements "was simply another illustration of [the witness'] untruthfulness rather than evidence almost unique in its detrimental effect on [the witness'] credibility." United States v. Brodie, 524 F.3d 259, 269 (D.C. Cir. 2008) (internal quotation marks omitted).

Although the scope of exculpatory or impeaching materials for which the prosecutor has a duty to identify is not unlimited, it does extend beyond the prosecutor's filing cabinet. As Professor LaFave explains, "[t]he prosecution's obligation under Brady extends to the files of those police agencies that were responsible for the primary investigation in the case." LaFave, § 24.3(b), at 435. The prosecution must search for impeachment material through a "reasonable inquiry of those in a position to have relevant knowledge." United States v. Osorio, 929 F.2d 753, 761 (1st Cir. 1991). By the same token, "the prosecution's obligation has been held not to extend to matters known to prosecutors in other counties, or to independent agencies not involved in the investigation of the case, such as a probation

department." LaFave, § 24.3(b), at 436-37 (footnote omitted). And information possessed by cooperating witnesses is not likely to be imputed to the prosecution. Id. at 437-38.

Finally, "exculpatory evidence must exist at the time of the trial to qualify as Brady material." Wright & Henning, § 256, at 141. For instance, where a city discovers internal misconduct after trial, failure to disclose that misconduct at or before trial is not a Brady violation because "evidence [that] did not exist at the time of trial . . . [is] not Brady material. United States v. Jones, 399 F.3d 640, 647 (6th Cir. 2005).

## IV. Discussion

The Court first turns to the defendants' request for an evidentiary hearing. The threshold showing for securing an evidentiary hearing on a Brady claim is lower than the necessary showing for establishing a Brady claim. Colón-Muñoz, 318 F.3d at 358. So, if the defendants have not made a sufficient showing to merit a hearing, they will have also failed to show a Brady or Giglio violation. See id. at 360.

The defendants point to three sets of allegedly suppressed evidence. The allegations associated with three sets, individually and collectively, do not merit an evidentiary hearing.

A.    **Materials Associated with Ochoa**

The first set of allegedly suppressed evidence deals with Ochoa-related materials.

Beyond their bald assertions, the defendants have offered no reason to think that, at or before the time of trial, evidence existed concerning the relationship between Ochoa, Pérez-Colón, and Figueroa.  Meanwhile, in addition to its assertions that the evidence did not exist in the government's possession at the time of the defendants' trial, the government has offered supporting affidavits, emails, and police reports.  See Docket No. 1979, Exs. 1-5; Docket No. 1996, Exs. 1-3.  Evidence that does not exist at or before the time of trial is not Brady material. Jones, 399 F.3d at 647; Wright & Henning, § 256, at 141.

The defendants point out that Pérez-Colón and Figueroa seem to have talked with Ochoa before the defendants' trial.  See Docket No. 1983 at pp. 8-9.  Perhaps Pérez-Colón and Figueroa were dealing with Ochoa because they wanted to obtain a benefit from the government later.  But if the government had no knowledge of these activities and possessed no related materials, there was nothing for which the government had a duty to disclose.  Jones, 399 F.3d at 647; Wright & Henning, § 256, at 141.  Information possessed by cooperating witnesses is not usually imputed to the prosecution.  LaFave, § 24.3(b), at 437-38.

There is likewise no support for defendants' belief that evidence existed at the time of their trial concerning Pérez-Colón's phone call to Ochoa in December 2016 and the anonymous tip to Puerto Rico police in July 2016. Defendants speculate that Pérez-Colón was cooperating with law enforcement before or during their trial to organize a phone call five months after the trial, but offer nothing to support that speculation. See Docket No. 1983 at pp. 20-21. Nor do they submit a reason to think the government was even aware of the anonymous tip at the time of the defendants' trial. By contrast, the government offers documents that support its rejection of that speculation.

Defendants raise what they see as problems with the documents submitted by the government. See Docket No. 1983 at pp. 2-3, 21-22. They believe that the affidavits are too particular in their language and could be shielding undisclosed evidence. Id. They also think the government should have provided more affidavits. Id.

Defendants' problems with the government's documents miss the point. The affidavits respond to the issue actually raised in defendants' original motion—whether Pérez-Colón and Marrero were confidential informants. See Docket No. 1967 at pp. 1-2. Defendants then broadened their argument, and now want the Court to fault the government for not hitting the target that

they belatedly moved (and muddled).  See Docket No. 1983 at pp. 2-
3, 21-22.  In any case, it is defendants' burden to raise a triable
issue meriting an evidentiary hearing.  See Connolly, 504 F.3d at
219-20; Colón-Muñoz, 318 F.3d at 358-60; Denunzio, 123 F. Supp. 3d
at 145; see also Jumah, 599 F.3d at 808-09; Douglas, 560 F.3d at
1173; Wright & Welling, § 586, at 488.  They have failed to meet
that burden.

        Evidence associated with the investigation into Ochoa's
2012 activities in New York may have existed at the time of the
defendants' trial.  The defendants, however, do not explain why
that evidence would be relevant to the verdict in their trial.
They wonder if the government placed Ochoa in the same prison as
Figueroa and Pérez-Colón to give the latter two an opportunity to
recruit Ochoa, see Docket No. 1983 at p. 10, but offer nothing to
support that conspiracy theory and do not identify any connection
with their own trial.  And even if the investigation into Ochoa's
2012 activities was somehow relevant to the defendants' trial,
there is no reason to think the investigative materials were
possessed by investigative agencies "in a position to have relevant
knowledge" in the defendants' trial.  Osorio, 929 F.2d at 761;
LaFave, § 24.3(b), at 436-37.

**B.    Speculation About Other Allegedly Suppressed Materials**

The second set of allegedly suppressed evidence is even more vague.  It consists of the defendants' speculation that there is evidence buried in the government's files to impeach Pérez-Colón or Marrero besides the Ochoa-related material.  See Docket No. 1983 at pp. 1-2, 14-16, 22-23.  Defendants suggest that possibly the evidence could pertain to their relationship with Figueroa.  Id. at p. 14-16, 22-23.  These allegations are a fishing expedition.  The sprawling list of documents that defendants seek is further confirmation of that fact.  Id. at pp. 19, 22-25.  The speculation is nowhere near sufficient to show that there is a dispute that undisclosed evidence has ever existed, much less a dispute that nondisclosure prejudiced defendants.  Jumah, 599 F.3d at 809.

**C.    The Six-Page Document**

The third set of allegedly suppressed evidence is the six-page document presented to Judge Pérez-Giménez and never shown to the defense.  Defendants are not entitled to a hearing related to this evidence because they have not sufficiently shown a dispute that they were prejudiced by the nondisclosure.

The six-page document had information about persons against whom Figueroa would testify.  See Docket No. 1528 at pp. 7-

11.  Figueroa, however, never testified, so there was no need to impeach him.

Defendants believe that the six-page document could have bolstered their effort to impeach the Marrero's and Pérez-Colón's credibility.  See Docket No. 1983 at pp. 13-14.  The defendants contend that it could have done so by showing that Marrero's and Pérez-Colón's cooperation was ongoing and far-reaching, that they coordinated their testimony, and that they were incentivized to lie because they were members of Figueroa's organization rather than Torres' organization.  Id.

The ways that the defendants think the evidence could, with a reasonable probability, have changed the trial were well explored during the trial.  The jury heard that Pérez-Colón and Marrero cooperated with law enforcement since 2011, engaged in dozens of interviews with law enforcement, testified in prior trials, expected benefits from the government, and received favorable sentencing recommendations.  See Docket No. 1534 at pp. 42-46; Docket No. 1539 at pp. 17-18, 21-22, 26, 51-52; Docket No. 1628 at pp. 34-35.  Their cooperation agreements, plea agreements, sentencing recommendations, and related documents were admitted into evidence at trial.  See Docket No. 1564 at pp. 12-16, 141-42; Docket No. 1539 at pp. 15-16; Docket No. 1534 at pp. 31-32; Docket No. 1531 at pp. 67-68, 73.  The jury also heard

the defendants' cross-examination of Pérez-Colón and Marrero
concerning purported coordination of testimony, including through
the use of illegal cell phones in prison.  See, e.g., Docket
No. 1534 at pp. 57-58; Docket No. 1547 at pp. 1-12.  And the jury
listened to the defendants' efforts to distinguish the Figueroa
organization from the Torres organization and the argument that
Marrero and Pérez-Colón lied because of that distinction.  See
Docket No. 1534 at pp. 58, 62-63, 84; Docket No. 1539 at pp. 27-
28, 33-34, 38, 76; Docket No. 1628 at pp. 36-37.  Jayson Dávila-
Reyes seemed to bolster that effort when he testified before the
jury that Figueroa wanted Marrero and Pérez-Colón to testify,
perhaps falsely, against Torres, Varestín, and others in the Torres
group.  See Docket No. 1547 at pp. 65-71.

       As such, based on the defendants' own assertions, the
six-page document would have been merely cumulative impeachment
information.  It is therefore insufficient to merit a hearing.
See Parker, 790 F.3d at 558; Brodie, 524 F.3d at 269; Dweck, 913
F.2d at 371; Wright & Henning, § 256, at 152.

       It is also noteworthy that impeaching Marrero and Pérez-
Colón would not have affected other evidence presented against
Varestín, Martínez, and Collazo.  Joseph González testified
without objection that he had source information that Varestín was
providing security for Torres.  See Docket No. 1534 at pp. 116-

17.  Martínez, according to both Joseph González and Jorge Figueroa-Agosto, was a drug trafficker.  <u>See</u> Docket No. 1537 at pp. 51, 112–13, 122.  Collazo's activities were discussed by Víctor Gómez, Ricardo Mayoral, and the four individuals associated with the insurance broker, among others.  <u>See</u> Docket No. 1539 at pp. 80–93, 99–106, 121–36, 141–44, 146–49.  So while Marrero and Pérez-Colón might have been key witnesses against three of the defendants, they were not the only witnesses.

###### D.  Allegedly Suppressed Information Taken as a Whole

Those three sets of evidence, even collectively, do not merit a hearing.  The first and second sets of allegedly suppressed evidence are not <u>Brady</u> material for the reasons discussed above.  So there is no collective impact from those two sets.  The third set also fails, as discussed above.  But even if the Ochoa-related material were considered suppressed impeachment evidence, its impact together with the six-page document would not move the needle.  Defendants are still merely seeking cumulative impeachment material.

Defendants have not made a sufficient showing to merit a hearing.  Hence, they have also failed to show entitlement to a <u>Brady</u> or <u>Giglio</u> order on the merits.

## V.   CONCLUSION

For the foregoing reasons, Varestín's motion requesting a hearing and an order, Docket No. 1967, is **DENIED,** and the other defendants' joinder motions, Docket Nos. 1987-92, are **MOOT**.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, March 25, 2020.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE